**William D. HILL, Petitioner-Appellant,**

v.

**W. J. WHEALON, Superintendent, Southern Ohio Correctional Facility, Respondent-Appellee.**

**No. 73–1549.**

United States Court of Appeals, Sixth Circuit.

Submitted Oct. 17, 1973.

Decided Jan. 11, 1974.

William D. Hill, pro se.

William J. Brown, Atty. Gen. of Ohio, Leo J. Conway, Asst. Atty. Gen., Columbus, Ohio, on brief for respondent-appellee.

Before PHILLIPS, Chief Judge, and EDWARDS and McCREE, Circuit Judges.

PHILLIPS, Chief Judge.

William D. Hill, the petitioner-appellant in this habeas corpus case, was given *Miranda* warnings immediately after being taken into custody and declined to make a statement. About an hour and a half later he again was given *Miranda* warnings by another officer and made an oral confession.

The District Court ruled that the confession was properly admitted into evidence. The record demonstrates to the satisfaction of this court that, under the facts and circumstances of this case, the prosecution has carried the "heavy burden" of proving that the confession was voluntary. We affirm the denial of the writ.

Hill contends that once he had declined to make a statement following *Miranda* warnings, any subsequent statement made by him necessarily would be

inadmissible. In support of this contention he relies upon the following language in Miranda v. Arizona, 384 U.S. 436, 473–474, 86 S.Ct. 1602, 1627, 16 L. Ed.2d 694 (1966):

"Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked."

Following the foregoing statement, the opinion in Miranda continues:

"If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. Escobedo v. Illinois, 378 U.S. 478, 490, n. 14, 84 S.Ct. 1758, 12 L.Ed.2d 977. This Court has always set high standards of proof for the waiver of constitutional rights, Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), and we re-assert these standards as applied to in-custody interrogation. Since the State is responsible for establishing the isolated circumstances under which the interrogation takes place and has the only means of making available corroborated evidence of warnings given during incommunicado interrogation, the burden is rightly on its shoulders.

"An express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver. But a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained." 384 U.S. at 475, 86 S.Ct. at 1628.

The question to be determined in this case, as in other cases involving Miranda warnings, is whether the prosecution has carried its "heavy burden" of establishing that Hill was advised effectively of his rights and whether his confession was made knowingly and voluntarily.

We agree with the language of Judge Matthes in Hughes v. Swenson, 452 F.2d 866, 868 (8th Cir. 1971):

"It is neither necessary nor desirable to undertake to fashion a per se rule to be applied in all cases presenting the Miranda issue. The crucial question always must be: has the prosecution sustained its heavy burden of demonstrating that the defendant was effectively advised of his rights, and did he knowingly and understandingly decline to exercise them?"

Hill was found guilty of second degree murder in a jury trial in the Court of Common Pleas of Lucas County, Ohio. On April 14, 1971, he was sentenced to life imprisonment in the Ohio Penitentiary. The conviction was affirmed by the Court of Appeals of the Sixth Ohio Appellate District. His motion for leave to appeal was overruled by the Ohio Supreme Court and the appeal dismissed for lack of a substantial constitutional question. The Miranda contention asserted in the present case was rejected by both of the Ohio Appellate Courts.

In denying the application for habeas corpus, District Judge Nicholas J. Walinski made the following findings, which are supported fully by the record:

"At or about 8:00 p.m. on the evening of September 9, 1970 Sergeant John Mason of the Toledo Police Department informed Detective Russ Field of the same police force, that he had received some information concerning a possible

homicide. Sometime between 9:00 and 9:30 p.m. of the same evening, in furtherance of the investigation, Detective Field and Lieutenant Gene Huffman picked up Sergeant Mason at his home and proceeded to the East Side where they picked up Deputy Chief Davy. They drove around the East Side looking for one Ronald Bennett, a person Sergeant Mason had interviewed earlier at about 5:00 p.m. on September 8th. They found Mr. Bennett between 11:30 p.m., and midnight and took him to the police station for questioning. Between midnight and 12:15 a.m. on the 9th of September, Mr. Bennett made a statement to Sergeant Mason and Detective Field which implicated William David Hill in the homicide case under investigation. At or about 1:00 a.m., subsequent to the interview with Bennett, Sergeant Mason learned that Mr. Hill had been taken into custody.

"Mr. Hill was taken into custody by Lieutenant Huffman and several other police officers at or about midnight on the 8th at the Arlington Hotel. He was taken from there to the police station by Lieutenant Huffman and two other officers. After they arrived at the police station, Lieutenant Huffman took Mr. Hill to the Detective Bureau. After informing him of his rights pursuant to the standards set forth in *Miranda*, Lieutenant Huffman asked Mr. Hill if he was willing to waive his rights and Mr. Hill replied unequivocally, that he was not. Thereupon Lieutenant Huffman had Mr. Hill booked, and shortly thereafter, Mr. Hill was placed in a cell at or about 12:30 a.m. on September 9th.

"Sometime around 1:00 a.m. of the same morning, Sergeant Mason became aware of the fact that Mr. Hill was in custody. At some time during this period he spoke to two of the officers who had apprehended Mr. Hill, Lieutenant Huffman and Deputy Chief Davy. Lieutenant Huffman, of course, was the person who attempted to interrogate Mr. Hill a short time before. The context of the conversation which these officers had was not brought out either on direct examination or on cross examination, but Sergeant Mason did testify that he was aware of the fact that Lieutenant Huffman had talked to Mr. Hill earlier. Whether Lieutenant Huffman informed Sergeant Mason that Mr. Hill refused to waive his constitutional rights during the earlier interrogation is not clear from the record, but, for the purpose of this petition, this Court will assume that Sergeant Mason was so informed.

"At approximately 2:00 a.m., Sergeant Mason and Detective Field went to Mr. Hill's cell. Mr. Hill was lying down at the time. They called his name; he sat up; and then Sergeant Mason truthfully related to him that they had obtained a statement from Ronald Bennett. Sergeant Mason then asked him if he wanted to talk about it and Mr. Hill said, 'Yes, I might as well.' (Record at 13). Immediately thereafter, Sergeant Mason and Detective Field escorted Mr. Hill from his cell to the Detective Bureau for the purpose of questioning him. Detective Field left the interrogation room soon after they arrived there to get some coffee for Mr. Hill; he did not return to the room until 2:25 or 2:30 a.m.

"Soon after Detective Field left, and before the questioning began, Sergeant Mason fully advised Mr. Hill of his constitutional rights. After reading each portion of the warning to him, he inquired of Mr. Hill whether he understood it and Mr. Hill indicated that he did. After completing the appropriate warnings, Sergeant Mason informed Mr. Hill that he could proceed no further with the interrogation unless Mr. Hill was willing to waive his rights. (Mr. Hill, having had the experience of the earlier interrogation with Lieutenant Huffman an hour and a half earlier, must have been aware of the fact that if he expressed a desire to proceed no further with the interrogation, the interrogation would cease.) Mr. Hill then stated that he was willing to waive his rights.

"Twenty-five to thirty minutes later, Detective Field returned to the interro-

gation room, presumably with some coffee, and at that time Mr. Hill was asked to repeat a statement which he had made to Sergeant Mason while they were alone. He was again advised of his rights by Detective Field, and Mr. Hill agreed to repeat his statement.

"After going over the statement one or two times, Sergeant Mason asked Mr. Hill if he was willing to have his statement recorded on a tape recorder. Mr. Hill indicated that he thought his statement had already been recorded, but when the officers informed him that it had not been, he said, 'Before I do that, I think I should probably talk to a lawyer.' (Record at 18.) Sergeant Mason ceased the interrogation immediately. He asked Mr. Hill if he wanted to call a lawyer; Mr. Hill said he did not. He asked him if he had a lawyer; Mr. Hill said he did not. Sergeant Mason asked Mr. Hill if he wanted him to call a lawyer for him; Mr. Hill said he did not. Then Mr. Hill was taken back to his cell.

"At approximately 8:30 a.m. on the same morning, Sergeant Mason returned to Mr. Hill's cell to determine whether or not he was willing to go with Sergeant Mason to point out the location of the car, the victim and the murder weapon. Sergeant Mason did so because Mr. Hill had told him during the 2:00 a.m. interview earlier that morning that he would take the police to the spot where he disposed of the body. Sergeant Mason again advised Mr. Hill of his constitutional rights and he told Mr. Hill explicitly that he did not have to go with him, that he did not have to show anyone anything. Mr. Hill indicated that he was willing to go. When they reached the detective car, Detective Sergeant Norbert Field again informed Mr. Hill that he did not have to go, but Mr. Hill indicated that he would go with them and at no time did he say that he did not want to proceed any further.

"These are the uncontroverted facts of the case upon which the trial judge based his decision on the motion to suppress.

\*    \*    \*    \*    \*    \*

"Based upon the facts related above, it is clear that the trial judge did not err when he factually determined that the statements given to the police were voluntary. The testimony of the police officers was uncontradicted. Mr. Hill never took the stand during the hearing despite the fact that cross examination at that hearing had to be limited solely to the issue of voluntariness. (Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).

"Given such uncontradicted testimony, this Court concurs in the determination made by the trial court that the statements were made voluntarily. Mr. Hill was fully advised of his constitutional rights twice in a period of ninety minutes; he was reminded of those rights at least three more times during the period. When he stated to Lieutenant Huffman that he did not wish to waive his rights, Lieutenant Huffman ceased interrogating him immediately. He did not request an attorney; he merely asserted his right to remain silent, thereby forcing the police to terminate the interrogation. Ninety minutes later, Sergeant Mason visited him at his cell; Sergeant Mason informed him that Ronald Bennett had made a statement, and he inquired of Mr. Hill if he had anything he wished to say. Without any further prompting, cajoling, harassment, threats or inducements, Mr. Hill said that he wanted to talk about it. The officers escorted him to an interrogation room; they asked him if he wanted anything to eat or drink; Sergeant Mason fully advised him of his rights; and Mr. Hill then proceeded, voluntarily, to make a statement. When Detective Field returned, Mr. Hill was reminded of his rights before he was asked to repeat his earlier statement; and knowing from his earlier experience that he could terminate the interrogation at will merely by saying that he did not wish to be questioned any longer, he went over his statement one or two more times. It was not until the officers asked him if they could tape record his statement that he expressed any reluctance to pro-

ceed any further; but after expressing his desire not to make such a tape without having counsel present on his behalf, he declined to call an attorney or have the police call one for him. Again, Mr. Hill was returned to his cell without any further interrogation taking place.

"When Sergeant Mason returned later that morning to see if Mr. Hill still chose to show the police where he disposed of the body and the murder weapon, a choice which Mr. Hill had expressed during the interview earlier that morning, he did not infringe any of Mr. Hill's constitutional rights. He was relying upon Mr. Hill's previous representations, *i.e.*, that he would assist the police. The fact that Mr. Hill said that he would not make a taped statement without counsel, should not have been construed by Sergeant Mason as anything other than that, *i. e.*, Mr. Hill would not make a taped statement, especially since Mr. Hill refused Sergeant Mason's offer to call an attorney for him. Sergeant Mason reminded Mr. Hill of his constitutional rights; he told him flatly that he did not have to go. Detective Sergeant Field reiterated this same point to him when Mr. Hill got in the car. Mr. Hill did what he did knowingly and voluntarily."

Sergeant John Mason, who made the second interrogation, testified as follows:

"Q   When was the first occasion that you talked with the defendant?

"A   About 2:00 a. m. on September 9, 1970.

"Q   What were the basic underlying circumstances involving that conversation?

"A   The reason I talked to him?

"Q   Yes.

"A   Well, we had some information that he was involved in a homicide.

"Q   At the time that you had talked with the defendant, had he been arrested?

"A   Yes, he had.

"Q   And the charge had been placed against him at that time?

"A   Yes, sir.

"Q   What were those charges?

"A   False hotel registration and murder.

"Q   Prior to talking to the defendant did you advise him of his constitutional rights?

"A   Yes, sir, I did.

"Q   Specifically what rights did you advise him of?

"A   I read him each of these rights that are posted on the rights chart in the conference room on the second floor of the Safety Building in the Detective Bureau. They are as follows, 'Notice. You have the right to refuse to make a statement and to answer questions. If you remain silent, your silence cannot be used against you in a court of law.'

"At that point I asked Mr. Hill if he understood what that meant and he said yes.

"I then said, 'Anything you do say can be used against you in the court of law.' I again asked him if he understood that, and he said, 'Yes.'

"I told him, 'You have the right to the presence of your lawyer during the questioning. If you cannot afford a lawyer, a lawyer will be appointed for you before the questioning if you so desire.' I asked him if he understood that, and he said, 'Yes.'

"I then told him 'Unless you are willing to give up the above rights, no statement of yours can be accepted and no questions will be asked of you.' I asked him if he understood that, and he said, 'Yes.'

"And I told him, 'The above rights stay with you and may be claimed now or at any time during the questioning.' I asked him if he understood that, and he said, 'Yes.'

"I asked if there is anything in his rights he did not understand or that he wanted explained to him, and he said, no, he understood them.

"I then told him, 'I can't talk to you or take any statement from you unless you are willing to waive these rights.' I asked him, 'Will you waive these rights?' And he said, 'Yes.'

"Q  Now, that conversation took place where?

"A  In the conference room in the Detective Bureau on the second floor of the Safety Building.

"Q  Who was present at the initial juncture?

"A  Mr. Hill and myself.

"Q  No one else was present at that time?

"A  Not at that particular time, no, sir.

"Q  Were these rights ever repeated to him again?

"A  Not verbatim but he was reminded of them.

"Q  At what juncture and relationship?

"A  About twenty minutes to half an hour later.

"Q  Who was present at that time?

"A  Detective Russ Field.

"Q  And the defendant?

"A  And Mr. Hill.

*    *    *    *    *    *

"Q  ·After you had initially advised the defendant of his rights, I think you indicated that you advised him of the fact no questions could be asked unless he waived those rights?

"A  Yes, sir.

"Q  And he consented to make a statement?

"A  Yes, sir.

"Q  And then did he thereafter make a statement to you concerning the offense with which he was charged?

"A  Yes, sir. ·

"Q  When those questions were put to him as to his rights, was he at that time aware of what charges had been lodged against him?

"A  Yes, sir.

"Q  Did you later have an occasion, subsequent to the statement that the defendant made to you, did you later have an occasion to have any communication with the defendant?

"A  Yes, sir.

"Q  When was that?

"A  About 8:30 a. m. on September 9, 1970.

"Q  What were the basic circumstances underlying that conversation?

"A  Well, during our conversation in the early morning hours at approximately 2:30 a. m., Mr. Hill made certain statements as to where a knife that was used in the commission of this offense was, and where Mr. Hill had put a car in the Maumee River, and where the offense had taken place. At that time we asked him if when it got light out in the morning if he would be willing to take us out to the locations and point them out. He indicated that he would.

"So I reported for work about 8:00 o'clock, and at 8:30 I went up to the turnkey's office. Mr. Hill was in Cell No. 3 in the jail. We got Mr. Hill out and I told him the purpose I was there, asked him if he was still willing to show us where these things took place and where the knife supposedly was. He said, 'Yes.'

"I again reminded him of his rights; that he did not have to show us; he had the right to have an attorney; he said, 'No, I will take you over.' "

*    *    *    *    *    *

"Q  Would you just again reiterate substantially what you advised the defendant of on that morning at approximately 8:30 in the morning?

"A  I told him that he had been advised of his rights, and that he knew what his rights were, and he did not have to go with us, he did not have to show us anything, and he indicated that he would.

"Q  And thereafter did you, you and the defendant, then proceed to the scene?

"A Yes. We took him down the elevator and put him in one of our detective cars, and at that time Detective Sergeant Norbert Field was in the car and Sergeant Field presently again advised him that, 'You do not have to go with us. You do not have to show us.' And he again indicated that he would.

"Q Now, during the course of both of these conversations, the one that took place in the interrogation room, the conversation that you had with him earlier that morning, did the defendant appear to you to be sober?

"A Yes, sir.

"Q Did he appear to be coherent and able to understand what you were talking about?

"A Yes, sir.

"Q At any time during the period of the conversations that you had with him in the interrogation room as well as the conversation you had with him in the early morning hours about 8:30 or so, and during the subsequent trip to the scene, did the defendant ever indicate that he did not desire to proceed any further?

"A No, sir."

The record shows that *Miranda* warnings also were given to Hill in substantially the same detail earlier the same night by Lieutenant Huffman of the Toledo police force.

■ Based upon the above-quoted testimony and other evidence in the record, we agree with the findings of the District Court that, under the facts of this case, the prosecution has sustained its "heavy burden" of demonstrating that Hill was effectively advised of his rights and that he knowingly and voluntarily declined to exercise them.

Hill contends that his confession was involuntary as a matter of law. He asserts that once he was advised of his *Miranda* rights and declined to make a statement, the police were precluded at all times thereafter from asking him any questions or talking with him about the case in any way. We join other circuits in refusing to adopt such a narrow construction of *Miranda*.

In United States. v. Collins, 462 F.2d F.2d 792, 802 (2d Cir. 1972), the Court of Appeals for the Second Circuit, in banc, said:

"[W]e are agreed that what *Miranda* requires is that 'interrogation must cease' until new and adequate warnings have been given and there is a reasonable basis for inferring that the suspect has voluntarily changed his mind."

To like effect see United States v. Jackson, 436 F.2d 39 (9th Cir. 1970), cert. denied, 403 U.S. 906, 91 S.Ct. 2209, 29 L.Ed. 682 (1971), [distinguishing United States v. Barnes, 432 F.2d 89 (9th Cir. 1970)], and Jennings v. United States, 391 F.2d 512 (5th Cir.), cert. denied, 393 U.S. 868, 89 S.Ct. 154, 21 L. Ed.2d 136 (1968).

■ Nor does the fact that Hill, having made a confession, later declined to made a taped statement until he had consulted counsel, negate the voluntariness of the earlier statement. As said by Judge Wisdom in United States v. Johnson, 455 F.2d 311, 314 (5th Cir. 1972):

" . . . Young concedes that he was given proper *Miranda* warnings when taken into custody by the state police and again when the FBI took him into custody. He argues, however, that his Fifth Amendment rights were violated when a statement was taken from him during interrogation after he had refused to sign a written waiver of his right to remain silent. When all the circumstances indicate that the defendant knew of his right to remain silent and intelligently waived that right, the refusal to sign a written waiver does not render a confession inadmissible."

*See also* United States v. Thompson, 417 F.2d 196, 197 (4th Cir. 1969), cert. denied, 396 U.S. 1047, 90 S.Ct. 699, 24 L. Ed.2d 692 (1970).

Affirmed.