**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Steven Michael GAY, Defendant-Appellant.**

**No. 75–1133.**

United States Court of Appeals, Sixth Circuit.

Aug. 8, 1975.
As Amended on Denial of Rehearing Oct. 20, 1975.

Richard J. Howard, Howard & Howard (Court appointed CJA), Kalamazoo, Mich., for defendant-appellant.

Frank S. Spies, U. S. Atty., Grand Rapids, Mich., for plaintiff-appellee.

Before MILLER and LIVELY, Circuit Judges, and FEIKENS,* District Judge.

LIVELY, Circuit Judge.

The issues before the court on this appeal do not require a lengthy recitation of facts. The appellant was convicted in a jury trial of an armed bank robbery in which a bank employee was shot to death. Gay and Donald Lee Gerlofs were jointly indicted and were tried together. Gerlofs has not appealed his conviction.

Appellant contends that the FBI agents who obtained confessions from him and Gerlofs failed to observe the requirements of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and that neither confession should have been admitted at their trial. The district court conducted an extensive hearing on motions to suppress, and at the conclusion thereof admitted the confessions, holding that they were "knowingly made with the full understanding of the right to remain silent and the right to an attorney, and with an understanding of the consequence of the waiver." (Transcript of hearing on motion to suppress, p. 270). The provisions of 18 U.S.C. § 3501 were fully complied with in making this determination and instructing the jury as to the weight to be given the confessions. The appellant contends on appeal that the confessions were inadmissible because the Fifth Amendment right of both defendants to remain silent was infringed by repeated interrogations.

Gerlofs and Gay were arrested separately. Gerlofs was immediately advised of his rights and denied at first that he knew where Gay could be found. After several requests for this information from the officers, Gerlofs told them that Gay was visiting a sick relative at a hospital. Several of the officers left to look for Gay and one FBI agent stayed with Gerlofs. After Gerlofs had again been given a statement of his rights he began to talk about his association with Gay and eventually admitted his participation in the bank robbery. He was then taken to the local courthouse where he signed a written waiver of rights and a detailed confession, both of which were admitted at the trial.

Following his later arrest, Gay refused to respond to questioning on three separate occasions before confessing. Each time he was given a statement of his rights, and questioning was stopped when he denied participation in the robbery. During the second interview Gay said he wanted to cooperate and signed a consent to search his car. The third interview took place just prior to Gay's appearance before a federal magistrate. He signed a waiver of rights form and, according to the FBI agent who questioned him, he confessed orally. Gay denied signing a form or making a statement at that time. Nevertheless, after his hearing before the magistrate Gay sent for the same FBI agent. At that time he signed another waiver and a written confession. Both waivers and the confession were admitted in evidence.

The district court correctly applied the law as set forth in *Hill v. Whealon,* 490 F.2d 629 (6th Cir. 1974). Both of the suspects were given separate, adequate warnings before each period of questioning. Furthermore, the questioning was not pressed in the face of denials, and

---

*The Honorable John Feikens, Judge, United States District Court for the Eastern District of Michigan, sitting by designation.

the evidence supports the conclusion that neither suspect ever refused absolutely to discuss the matter or requested an attorney. The record indicates that both understood their rights and were trying to decide what course to follow during the relatively brief time between their arrests and confessions. Shortly before Gay's confession was received the agents had "a reasonable basis for inferring that the suspect ha[d] voluntarily changed his mind." *United States v. Collins,* 462 F.2d 792, 802 (2d Cir.) (en banc), *cert. denied,* 409 U.S. 988, 93 S.Ct. 343, 34 L.Ed.2d 254 (1972). The entire record supports the conclusion that the prosecution sustained its "heavy burden" of showing that the confessions were voluntarily made and that the right of appellant and his co-defendant to remain silent was not violated. *Miranda v. Arizona, supra,* 384 U.S. at 475, 86 S.Ct. 1602; *United States v. Rimka,* 512 F.2d 425 (6th Cir. 1975); *Hill v. Whealon, supra,* at 635.

■ Appellant pled insanity as his defense and in his opening statement counsel for Gay admitted many of the facts surrounding the fatal robbery. He alleges prejudice from the denial by the district court of his motion for a separate trial from that of his accomplice. He claims particularly that the introduction of Gerlofs' confession harmed his case. The court instructed the jury that it could consider each confession only in connection with the charges against the person who gave it. Gay's name was deleted from Gerlofs' confession and "my friend" was substituted. The jury was not permitted to see the written confessions or to take them to the jury room. The appellant has not specified the prejudice which he claims resulted from the joint trial. The Bruton rule (*Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968)) was not violated in this case, and the district court did not abuse the discretion granted it by Rule 14, Fed.R.Crim.P., in denying Gay's motion for a severance. *United States v. Dye,* 508 F.2d 1226, 1236 (6th Cir. 1974), *cert. denied,* 420 U.S. 974, 95 S.Ct. 1395, 43 L.Ed.2d 653 (1975); *United States v. Franks,* 511 F.2d 25 (6th Cir. 1975), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 693 (1975).

■ Appellant's claim that his conviction should be reversed because of the court's refusal to excuse two jurors for cause is without merit. These jurors were aware of some of the pretrial publicity concerning the bank robbery. However, in separate questioning the trial judge determined that they had not formed opinions about the case, and questioning by counsel did not disclose any predisposition toward a finding of guilt. In the trial of a case involving a crime which attracts the attention of the press it is inevitable that some jurors will have some knowledge of the facts. If a juror can lay aside any preconceptions about the case and try it solely on the evidence presented in court, it is not error to fail to dismiss such a juror for cause. *Murphy v. Florida,* 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); *Irvin v. Dowd,* 366 U.S. 717, 722–23, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); *Holt v. United States,* 218 U.S. 245, 248, 31 S.Ct. 2, 54 L.Ed. 1021 (1910).

Appellant asserts two related grounds for reversal in connection with the treatment of his insanity defense. He argues that he was entitled to a directed verdict of acquittal because the only competent evidence on this issue was to the effect that he was not legally sane at the time the crime was committed. This is based on his contention that the psychiatrists who testified for the government applied the wrong tests of legal insanity and their evidence should have been stricken. We disagree. While it is true that the prosecution's medical witnesses gave answers on cross-examination which indicated disagreement with theories held by other psychiatrists, and some confusion about the criteria to be applied, these were matters to be considered by the jury in determining which testimony to accept. The fact remains that on direct examination both witnesses were asked if appellant was suffering from any mental illness, defect or disorder which

would render him incapable of conforming his conduct to the requirements of the law. Both answered that appellant did not have such a condition, though each made a diagnosis of "antisocial personality."

◼ In *United States v. Smith*, 404 F.2d 720 (6th Cir. 1968), this court adopted, with one exception, the ALI Model Penal Code test of criminal responsibility:

"A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of the law." *Model Penal Code* § 4.01 (Official Draft, 1962). 404 F.2d p. 726.

The court did not adopt the following definition which was accepted by the ALI:

As used in this Article, the terms "mental disease or defect" do not include any abnormality manifested only by repeated criminal or otherwise antisocial conduct. Model Penal Code § 4.01(2) (Official Draft, 1962).

It is appellant's position that in rejecting the above language this court intended to imply that the condition variously described as "antisocial personality" and "psychopathic personality" must, as a matter of law, be included in the legal definition of insanity. Thus he contends that the district court committed error in charging the jury that the abnormality referred to as psychopathic personality or antisocial personality is a condition "which may or may not be included within the definition of mental disease or defect." It is contended that the jury should have been instructed that psychopathic or antisocial personality is a mental illness, leaving for decision only whether this condition rendered appellant substantially incapable of conforming his conduct to the requirements of the law. In refusing to adopt language which excludes an abnormality manifested *only* by antisocial conduct from the definition of mental illness, this court did not hold that every person diagnosed as psychopathic or antisocial personality is, as a matter of law, suffering from a mental illness or defect.

◼ In *Smith,* we framed the questions to be submitted to juries required to determine the issue of legal sanity in criminal cases. The District Judge in the present case submitted the required questions, the first of which was whether Steven Gay was suffering from a mental illness at the time of the commission of the robbery. Though the medical witnesses for the prosecution and the defense agreed that appellant is a psychopathic personality, they disagreed sharply on whether or not he was suffering from a mental illness or defect. It was properly left to the jury to decide which testimony to accept and, in the event of a finding that a mental illness or defect did exist, to go on to determine whether or not it so affected his conduct as to relieve him of legal responsibility for his criminal acts. We find no error in the denial of appellant's motion for a directed verdict or in the district court's instructions on the issue of insanity.

◼ The appellant requested the trial court to instruct the jury that if he was found not guilty by reason of insanity he would be committed to a psychiatric institution until he regained his sanity. Federal courts have no authority to commit a defendant found not guilty by a jury for psychiatric treatment and the requested instruction would have been an erroneous statement of the law, dictum in *Pollard v. United States,* 285 F.2d 81, 82–83 (6th Cir. 1960), notwithstanding. *See Pope v. United States,* 372 F.2d 710, 731–32 (8th Cir. 1967), *vacated for resentencing,* 392 U.S. 651, 88 S.Ct. 2145, 20 L.Ed.2d 1317 (1968).

Finally the court considers appellant's charge that the "court erred in excusing jurors already impaneled and sworn without presence of Gay, his lawyer or explanation of reasons for excusing jurors." The jury was selected and sworn

on October 14, 1974 and then dismissed until the trial began nine days later. At the opening of the trial on October 23rd, the Judge advised the jury that he had determined that it should be sequestered. Counsel had not been informed of this decision at the time the jury was selected or during the period which intervened between selection and the trial. Immediately after the court had told the jury of the sequestration decision, defense counsel inquired about the composition of the jury. Two regular jurors and one alternate had been excused by the court, and trial was begun with ten of the original regular jurors and two of the persons chosen as alternates sitting as regular jurors.

The following colloquy occurred immediately prior to the opening statement:

MR. HIRSCH: I do object to the fact that we don't know what jurors were excused. I don't know whether the alternates were the ones that were excused or the original members of the panel, if alternates or original members of the panel were excused. I am going to object to the fact that we had six alternates, and some of them are now sitting on the jury panel itself as a regular juror as opposed to alternates when we selected more.

THE COURT: The purpose of alternates is to provide ultimately to have at least twelve persons in the box, and the purpose of giving you an opportunity to examine them is precisely for that purpose. You are examining them in the same manner as you do a juror. The alternates go through the same process in the determination of fairness. And it is the experience of the Court that people get sick, that members have their family problems, which press them and which calls for excuse. And there were three, I think, three such situations.

THE CLERK: Yes, Judge.

THE COURT: In which I made that judgment.

THE CLERK: Two regulars and one alternate.

MR. HIRSCH: Yes, your Honor. I believe the problem is more clearly articulated in the fact that with the alternates we were only allowed a certain number of preemptory challenges. Those challenges, if the Court will recall, were executed very early in the selection process. From that point on we were stuck with the jurors that were alternates.

THE COURT: That doesn't make any difference in the Federal Court.

MR. HIRSCH: Your Honor, if the jurors are not here because of the fact—a regular juror is not here because they were unable to be sequestered, and if that is the reason they are not here—that is something which was not known to us, nor to the jurors. Had it been known to the jurors, they could have been excused for cause. And if the alternates, who are now sitting on the regular panel, had been on the regular panel, we could have challenged some of them for cause—or, preemptorily when we had the extra preemptory challenges left on the jury panel itself but not on the alternates. I merely want it on the record.

THE COURT: It is on the record. I ruled against you. A full opportunity was given for thorough examination of each of the persons, alternate or direct. And the methods of drawing juries in Federal Courts varies across the country, varies substantially from the State Court practice, and this is the proper procedure.

All right.

Appellant concedes that it is permissible for a trial judge to hear requests out of the presence of counsel from prospective jurors wishing to be excused from jury service. Wright, *Federal Practice and Procedure,* § 384. He insists, however, that once the jury has been selected and sworn it is error for the court to excuse a juror without "notice to the defendant or his counsel and without explanation . . . ."

Rule 43, Fed.R.Crim.P., provides: "The defendant shall be present . . . at

every stage of the trial including the impaneling of the jury . . . except as otherwise provided by these rules." The Supreme Court has recently dealt with the matter of communications between a jury and the trial judge and concluded that messages from a jury should be answered in open court with an opportunity for counsel to be heard before the court responds. *Rogers v. United States,* 422 U.S. 35, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975). The holding was based upon the requirements of Rule 43 and cases decided prior to the effective date of the rules. In *Fillippon v. Albion Vein Slate Co.,* 250 U.S. 76, 81, 39 S.Ct. 435, 436, 63 L.Ed. 853 (1919), a civil action, the Court held that the parties have the right to be present in person or by counsel "at all proceedings from the time the jury is impaneled until it is discharged after rendering the verdict." In *Shields v. United States,* 273 U.S. 583, 588–89, 47 S.Ct. 478, 71 L.Ed. 787 (1927), the Court noted that *a fortiori,* the same rule would apply in a criminal case.

■■ We hold that it was error for the District Judge to engage in discussions with members of the jury after it was impaneled and to consider requests for excuses out of the presence of the defendant and without giving notice to defense counsel. This does not preclude the parties and counsel from agreeing to *in camera* consideration of requests to be excused, but the decision as to whether this may be done is that of the parties, not the court. The defendant should have an opportunity to object to requests for excuses from the jury and to make a record of the proceedings. This holding does not affect the discretion of the trial court to dismiss a juror and replace him with an alternate, or dismiss an alternate for illness, hardship or other cause. However, even though such dismissals are within the discretion of the trial judge and do not require the consent of the parties, his discretion is always subject to review for abuse, and a record is necessary for such review.

The Supreme Court noted in *Rogers* that "a violation of Rule 43 may in some circumstances be harmless error . . . ." (95 S.Ct. 2095). Even though the appellant has not been able to demonstrate prejudice in the present case, the total absence of a record of the proceedings in which the changes in the makeup of the jury occurred requires us to assume prejudice. We have the utmost confidence in the integrity of the District Judge who presided in these proceedings, and of the trial judges of the circuit individually and as a group. However, in a time when our judicial system is being severely questioned, it is as important to maintain the appearance of justice and regularity as it is to be certain of their reality.

■ This case also presented the anomalous situation of a jury panel being subjected to a long selection process in which many facets of the case were revealed to them, after which they were permitted to separate for a period of nine days, only to be told upon returning to court for the beginning of the trial that they would be sequestered. Ordinarily the decision to sequester a jury should be made prior to its impaneling. It is possible that voir dire might be conducted differently and challenges exercised on the basis of the responses of veniremen to the prospect of sequestration. We recognize that there are situations which may arise after the commencement of a trial which may lead to an order of sequestration. This remains a matter for the discretion of the trial judge. However, the earlier a decision to sequester a jury is made the less likely it is to adversely affect the orderly conduct of the trial.

The judgment of the district court is reversed, and the case is remanded for a new trial.