**NOT RECOMMENDED FOR PUBLICATION**
File Name: 05a0729n.06
Filed: August 19, 2005

**No. 04-5780**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| | * | |
| Plaintiff-Appellee, | * | |
| | * | |
| v. | * | ON APPEAL FROM THE UNITED |
| | * | STATES DISTRICT COURT FOR THE |
| JOEY LEE GOINS, | * | EASTERN DISTRICT OF TENNESSEE |
| | * | |
| Defendant-Appellant. | * | **O P I N I O N** |
| | * | |
| _____/ | * | |

**BEFORE:** **CLAY, GILMAN, and COOK, Circuit Judges.**

**CLAY, Circuit Judge.** Defendant Joey Lee Goins appeals his convictions for carjacking resulting in death, 18 U.S.C. § 2119(3), bank robbery by force or violence with a dangerous weapon, 18 U.S.C. §§ 2113(a) and (d), and conspiracy to commit those offenses, 18 U.S.C. § 371. Goins contends that: (1) the district court erred in denying his suppression motion; (2) his trial should have been transferred or the jury sequestered due to extensive media coverage of the crimes with which he was charged; (3) the district court committed various reversible evidentiary errors; and (4) the district court erred in denying his motion to sever the carjacking count. For the reasons that follow, we **AFFIRM** the judgment of the district court.

## BACKGROUND

The facts are taken from the evidence presented at trial and are viewed in the light most favorable to the government. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

Goins and Justin Jones first met when the two were patients in the psychiatric ward of an army hospital at Fort Benning, Georgia. Both men had gone AWOL and thought they were likely to be discharged from service in the army. According to Jones, Goins suggested that the two could rob a bank in Virginia once they were discharged. In February 2002, the army honorably discharged Jones and he returned to Sullivan County, Tennessee, where he moved in with the family of his friend, Justin Starnes. In early March 2002, the army discharged Goins, whereupon he also moved in with the Starnes family. Later that month Goins secured a loan from an accounting firm in Bristol, Tennessee; the loan was made in anticipation of a tax refund of the same amount. Goins cashed the loan check at the First Bristol Bank and later told Jones it would be a good bank to rob.

In testimony Goins contends should have been excluded, Jones stated that in early April 2002, he and Goins robbed Joey Woltz in the parking lot of a Bristol mall. Goins represented that he was an undercover police officer investigating drug activity; he showed Woltz a badge and his gun. Although the two had not planned on impersonating police officers, Jones followed Goins's lead and pretended that he too was an undercover officer. Goins searched Woltz and took cash from his person. Still holding himself out as a police officer, Goins told Woltz he suspected the cash was drug money but told Woltz he could have the money back if his supervisor (Woltz worked at a nearby restaurant) confirmed it was actually tip money or wages. After Woltz went in search of his supervisor, Goins and Jones left the scene, with $200 in hand. According to Jones, they robbed Woltz because they were in need of cash, having spent the bulk of Jones's tax refund on a sniper rifle.

2

On April 12, 2002, having decided to rob the First Bristol Bank, Goins and Jones set out to steal a car they could use to carry out the robbery. On the night of April 12, 2002, Goins and Jones staked out a parking lot at Eastern Tennessee State University (ETSU). At around midnight, James Norwood, an ETSU freshman, entered the lot and approached his car, a blue Toyota Supra. Goins and Jones, again posing as undercover police officers, grabbed Norwood, patted him down and forced him into the back seat. Norwood asked Goins for police identification and his response was to point a gun in Norwood's face. Jones drove Norwood's car to a church in Johnson City, Tennessee; Goins sat in the back seat with Norwood. When Jones parked the car, Goins began to taunt Norwood with threats of killing him in various ways. Goins then choked Norwood to death. When Jones began to lose his cool, Goins said something to the effect of "calm down, you're part of this too." Goins and Jones returned to ETSU and, using Norwood's ID card, gained access to his dorm room, where they looked for things to steal. The two then buried Norwood's body off of Highway 154 in Sullivan County, Tennessee, using a shovel they had taken from the house of the Thomas family in Bristol, where Goins and Jones occasionally stayed. The next morning, Goins and Jones discarded the gloves and clothes they had worn the night before and cleaned Norwood's car in order to remove fingerprints and traces of DNA.

Two days later, on April 15, 2002, Goins robbed the First Bristol Bank, with Jones as the getaway driver. They first practiced the getaway plan, according to which Goins was to drive Norwood's Toyota Supra while Jones waited in another car at a nearby park. When Goins completed the robbery and arrived at the park, they would abandon Norwood's car and proceed in the other one. Goins and Jones carried out the robbery according to the plan. According to

surveillance footage and the testimony of bank employees, Goins wore a hat, distinctive black army pants, and a bandana, which covered his face. Goins pointed a handgun at the employees and ordered them to fill a gift bag he was carrying with money. He then left; witnesses observed him enter the Toyota Supra and recorded its license plate number. The total proceeds of the robbery amounted to $2,000.

Goins and Jones then abandoned Norwood's car, the gift bag, and Goins's clothes (except for his distinctive black army pants) at the park. The two then moved in permanently with the Thomas family in Bristol. During the their time there, Goins had an intimate relationship with Antoinette Thomas and Jones told Antoinette's daughter, Beth, about Norwood and the bank robbery. Beth Thomas once observed Jones burning various papers belonging to Norwood in the Thomases' back yard. Goins grew domineering and aggressive, taking over the Thomas house to such a degree that he began to refer to it as "Ft. Goins." On at least one occasion, Goins and Jones exchanged blows, and Jones confided in Beth that he was afraid Goins would kill them if Goins found out Jones had talked about their crimes. Nevertheless, in conversations with associates, Jones mentioned having participated with Goins in the bank robbery and carjacking. Ultimately, word of Jones's involvement in the crimes reached an ETSU teacher, who informed the Bristol police of what she had heard. In July 2002, Bristol police detectives began investigating Jones.

Jones testified that during the summer of 2002 Goins routinely threatened to take action against Jones, Jones's family, or the Thomases if Jones said anything about the crimes. At the same time, Goins continued to press plans for other robberies. Jones, who testified that he was "full of anxiety," tried to distance himself from Goins in the hopes that Goins would abandon his plan to

4

commit more robberies. On July 30, 2002, Jones realized that Goins was intent on committing more robberies even without Jones's assistance. On that day, as Goins drove Jones to a local school where he was to attend a band camp, Goins told Jones that a friend of his was coming from one of the Carolinas and would assist him in committing crimes. After Goins had dropped Jones off, Jones confided in friends at the camp, including Beth Thomas, that he had become desperate and intended to call the police. Jones testified that "it wasn't going to stop regardless of me; and it was just getting to be too much, and I had to call the police." Jones used his cell phone to call the police. He asked for Deputy David Jones, whom he knew from a sheriff's department program in which he had participated. Jones told Bristol police officers about the murder of Norwood and the robbery of the First Bristol Bank. He also took officers to the spot where he and Goins had buried Norwood. A forensic expert later confirmed that the body in the shallow grave was indeed Norwood's. The police placed Jones in custody.

Jones ultimately sat for an interview with detectives, one of whom was Debbie McCauley, the detective who began to investigate Jones after receiving the tip from the ETSU teacher. Jones initially admitted only to having participated in the bank robbery but later admitted his involvement in the murder of Norwood. In August 2002, detectives obtained a search warrant to search the Thomas residence. When they arrived to perform the search, the officers also obtained Antoinette's consent. In the garage, the police uncovered a handgun which was consistent with the description of the gun used in the bank robbery. In the room shared by Goins and Antoinette, police uncovered a loaded sniper rifle with a scope, a .22 caliber pistol and ammunition that Jones confirmed was purchased by him and Goins, black army pants that looked like the ones Goins wore during the

5

robbery, and a bandana tied to be worn as a mask. The police arrested Goins, and he and Jones were held in various county jails on state bank robbery charges until they were indicted by a federal grand jury on August 27, 2002. During pre-trial detention, Jones received at least three written threats from Goins. One included a drawing depicting Jones as an inmate being sexually assaulted by other inmates. Jones turned the notes over to prison officials; some were introduced against Goins at trial.

The government charged Goins and Jones with conspiracy, 18 U.S.C. § 371, aiding and abetting each other in a carjacking resulting in death, 18 U.S.C. §§ 2, 2119(3), and aiding and abetting each other in a bank robbery by force or violence with a dangerous weapon, 18 U.S.C. §§ 2, 2113(a) and (d). Pursuant to a plea agreement, Jones pled guilty to conspiracy, carjacking, and bank robbery. Goins moved to suppress the evidence uncovered at the Thomas residence, and, after holding an evidentiary hearing, a magistrate judge recommended that the motion be denied. The district court heard Goins's objections and accepted the magistrate judge's recommendation. The district court also denied Goins's motions to transfer venue to the Eastern District of Kentucky, to sequester the jury, and to sever the carjacking count of the indictment for a separate trial. After an eleven day trial at which Jones testified against Goins, the jury convicted Goins of conspiracy, carjacking resulting in death, and bank robbery by force or violence with a dangerous weapon. The district court denied Goins's motion for a judgment of acquittal or a new trial and sentenced him to 60 months' imprisonment for conspiracy, life imprisonment for carjacking, and 300 months' imprisonment for bank robbery.[1]

---

[1] Jones received a 540-month sentence after a downward departure for furnishing substantial assistance to the government. U.S.S.G. § 5K1.1. We addressed Jones's appeal of his sentence in a separate opinion. *See United States v. Jones*, — F.3d —, No. 04-5618, 2005 WL 1847234 (6th

## DISCUSSION

### A.    Motions to Transfer Venue and Sequester the Jury

Goins moved for a change of venue under Fed. R. Crim. P. 21(a), which provides that "[u]pon the defendant's motion, the court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." *Id.* We review the district court's denial of this motion for abuse of discretion, *United States v. Bell*, 351 F.2d 868, 875 (6th Cir. 1965); *United States v. Bruce*, Nos. 95-6046 to 95-6049, 1996 WL 640468, at *5 (6th Cir. Nov. 5, 1996) (unpublished), and find none.

According to Goins, a change of venue to the district court in Pikesville, Kentucky was necessary because the disappearance of the carjacking victim, James Norwood, received press coverage throughout northeastern Tennessee, southwestern Virginia and western North Carolina. In addition, Goins points out that Jones's statement to the Bristol police, in which he named Goins as his co-perpetrator, made its way to the press. It is undisputed that the crimes and the arrests of Goins and Jones received media coverage in 2002. However, it is clear that the trial judge took appropriate steps to ensure that this press coverage did not bias any potential jurors or actual jurors and, hence, that the coverage did not prejudice Goins.

This circuit's leading case on change of venue under Rule 21(a) remains *United States v. Johnson*, 584 F.2d 148 (6th Cir. 1978). In *Johnson*, this Court instructed as follows:

---

Cir. Aug. 1, 2005).

> The merit of a change of venue motion is most likely to be revealed at voir dire of the potential jurors. Through proper questioning the court can determine the extent of the veniremen's exposure to the publicity and the effect it has had upon them. Exposure to publicity alone does not presumptively deprive the defendant of his right to fair and impartial jurors. *Murphy v. Florida*, 421 U.S. 794, 799, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). *See also Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 551-56, 565, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976). Rather, the test is whether any potential juror who has been exposed to publicity "can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751 (1961). *See also Murphy, supra*, 421 U.S. at 800, 95 S.Ct. 2031; *United States v. Gay*, 522 F.2d 429, 432 (6th Cir. 1975).

*Id*. at 154. The *Johnson* Court upheld the district court's denial of the motion for a change of venue because "all of the veniremen who had read, heard or seen anything about the case said this exposure would not affect their decision and that they had not formed any opinion on the matter." *Id*.

Goins points to no jurors who stated that pre-trial publicity caused them to form an opinion on the case. The district court permitted individual voir dire in order to assess the effects of pre-trial publicity. In fact, the district court held that it would "extensively question potential jurors in regard to any prior media impact" and instructed Goins that his motion for a change of venue "may be renewed at voir dire if it appears that a fair and impartial jury cannot be seated." Every indication suggests the court did engage in extensive questioning of potential jurors and, moreover, Goins did not renew his motion for a change of venue.

On appeal, Goins does not offer citations to the voir dire record, instead resting his claim on the general contention that merely because the media reported on the crimes with which he was charged, a change of venue was necessary. However, as this Court has observed, "[a] juror's exposure to news accounts about the crime charged, standing alone, does not presumptively establish that the defendant was denied a fair trial." *United States v. Chambers*, 944 F.2d 1253, 1262 (6th Cir.

1991) (citation omitted), *superseded on other grounds by statute as recognized in United States v. Avery*, 128 F.3d 966, 972 (6th Cir. 1997); *see also Dobbert v. Florida*, 432 U.S. 282, 302-303 (1977).

The exception to this rule is the principle the Supreme Court announced in *Rideau v. Louisiana*, 373 U.S. 723 (1963). *See Chambers*, 944 F.2d at 1262. In *Rideau*, a film of the defendant confessing to bank robbery, kidnaping, and murder was broadcast on three occasions to residents of the Louisiana parish in which the crimes occurred. 373 U.S. at 724. The Supreme Court cited data to the effect that in a parish with a population of approximately 150,000 people, as many as 97,000 (almost two-thirds) saw at least one showing of the defendant's confession on television. *Id*. The Court held that under such circumstances, prejudice to the defendant must be presumed because the community had been "repeatedly" and "pervasively" exposed "to the spectacle of Rideau personally confessing in detail to the crimes with which he was later to be charged." *Id*. at 726. We have observed that "[t]wo factors were critical in *Rideau*[:] first, the pervasive quantity of publicity and, second, the inherent prejudice in a confession." *Johnson*, 584 F.2d at 154.

Neither of the two critical *Rideau* factors are present here. First, Goins does not cite any evidence regarding the nature and extent of pre-trial publicity, so this Court cannot know whether the publicity reached the level of pervasiveness that concerned the Supreme Court in *Rideau*. Second, Goins did not confess, let alone confess on camera in a recording that was later broadcast to two-thirds of the relevant population. *Compare Rideau*, 373 U.S. at 724-26. Accordingly, the

9

general rule applies and the district court was within its discretion to deny the request for a change of venue. *See Johnson*, 584 F.2d at 154; *Chambers*, 944 F.2d at 1262.

Goins also moved to have the jury sequestered. The district court's denial of this request is reviewed for abuse of discretion. *United States v. Elder*, 90 F.3d 1110, 1130-31 (6th Cir. 1996). The district court declined to immediately sequester the jury and indicated it would do so "only as a last resort." The court further explained that it would "admonish the jury not to read or listen to any news stories or articles on each occasion that the jury is excused from the courtroom, and [would] inquire whether the jury has adhered to the admonishment each morning." There is no indication that the district court failed to adhere to this plan and Goins does not allege as much.

In *Johnson*, this Court stated: "we believe that the failure to sequester a jury standing alone could rarely, if ever, constitute reversible error. A defendant would have to demonstrate actual prejudice or at least substantial likelihood thereof flowing from the failure to sequester in order to warrant a new trial." 584 F.2d at 155. Goins, as discussed above, presents no evidence tending to show he was prejudiced. Moreover, we may not presume that the jurors disobeyed the district court's daily admonishment not to pay attention to news accounts of the case. *United States v. Metzger*, 778 F.2d 1195, 1209 (6th Cir. 1985); *see also Elder*, 90 F.3d at 1131. Finally, for the reasons just discussed, *Rideau* does not apply here. In any event, *Rideau* involved pervasive *pre-trial* publicity such that the only constitutionally acceptable remedy was a transfer of venue. In sum, the district court did not abuse its discretion in denying Goins's motion for a change of venue and his motion to sequester the jury.

**B.     Evidentiary Claims**

Goins contends it was reversible error for the district court to permit Jones to testify about a trip he and Goins had taken to Radford, Virginia, before the date charged as the commencement of the conspiracy. He makes the same argument in connection with Jones's testimony regarding the Woltz robbery, which also occurred before the date on which the conspiracy began. The district court admitted both lines of testimony under Fed. R. Evid. 404(b) on the ground that Jones's accounts of the two events were probative of a plan or preparation for the charged offenses.

### 1.    The Radford Trip

In a pre-trial 404(b) hearing, the government represented that Jones would testify that he and Goins went to Radford, Virginia to commit robberies, case banks, and to obtain guns for future bank robberies. Because of this last purpose of the trip, the government argued the testimony would be admissible to show planning or preparation. *See* Fed. R. Evid. 404(b). The district court thus permitted Jones to testify about the Radford trip, but Jones in fact made no mention of intending to obtain, or in fact obtaining, guns for future bank robberies while he and Goins were in Radford. Consequently, the district court concluded that the testimony did not match up with the representations made in the government's required pre-trial 404(b) notice and the court accordingly found that the testimony had been admitted in error. Goins moved for a mistrial. Instead of granting the motion, the district court instructed the jury that Jones's testimony about the Radford trip was not to be considered and was stricken from the record. We review the denial of a motion for a mistrial for abuse of discretion. *United States v. Trujillo*, 376 F.3d 593, 613 (6th Cir. 2004); *United States v. Yang*, 281 F.3d 534, 549 (6th Cir. 2002).

The government concedes that the testimony about the trip to Radford was admitted in error but maintains that a mistrial was unnecessary because of the district court's curative instruction. The general rule is that a curative instruction of the sort given to the jury here cures any harm that might flow from the erroneous admission of prior act evidence. *United States v. Layne*, 192 F.3d 556, 573 (6th Cir. 1999); *United States v. Ursery*, 109 F.3d 1129, 1133-34 (6th Cir. 1997); *United States v. Steele*, 727 F.2d 580, 588 (6th Cir. 1984). The exception is when the erroneously admitted evidence is "so prejudicial that a jury could not be trusted to disregard it." *Ursery*, 109 F.3d at 1133-34; *Chambers*, 944 F.2d at 1263. But jurors are presumed to understand an instruction that they disregard stricken evidence, *see, e.g., Chambers*, 944 F.2d at 1263, and Goins does not claim that the jury misunderstood or disobeyed the district court's instruction here. Moreover, Goins makes no attempt to explain how the testimony about the Radford trip prejudiced him, instead mistakenly relying on cases addressing the lesser remedial value of limiting (in contrast to curative) instructions. *See United States v. Jenkins*, 345 F.3d 928, 939 (6th Cir. 2003); *United States v. Haywood*, 280 F.3d 715, 724 (6th Cir. 2002) (when the district court erroneously admits 404(b) evidence, does not strike it from the record, and fails to instruct the jury to disregard it, an ordinary limiting instruction will not always be sufficient to cure potential prejudice). Here there is no reason to depart from the presumption that the curative instruction accomplished its task. Accordingly, the district court did not abuse its discretion in denying the motion for a mistrial.

## 2. The Woltz Robbery

Over the defense's objection, Jones also testified about the Woltz robbery, which he and Goins perpetrated 12 days before the bank robbery. We review the district court's decision to admit this testimony for abuse of discretion. *United States v. Copeland*, 321 F.3d 582, 595 (6th Cir. 2003).

At the pre-trial 404(b) hearing, the government represented that Goins and Jones viewed the robbery of Woltz as a "dry run" for their subsequent crimes, in the sense that they apparently intended to pose as law enforcement officers when they carried out the carjacking. Consequently, the government moved for the admission of testimony relating to the Woltz robbery on the ground that it was evidence of planning or preparation. Fed. R. Evid. 404(B). The district court permitted Jones to testify, but his initial testimony did not readily link the Woltz robbery to the carjacking. Indeed, the only time Jones even connected the Woltz robbery to the later crimes at this initial stage was by way of saying that "bank robbery sort of takes a little working up to; and we were sort of low on cash . . . ." Jones did say that Goins was "playing around like he's a police officer" but did not suggest this was a conscious or planned decision, nor that it was reflective of what they intended to do at the later carjacking. The defense objected and the district court took the matter up after excusing the jury.

In the jury's absence, the district court examined Jones to determine whether his testimony regarding the Woltz robbery was indeed admissible to show planning or preparation. Jones stated that the purpose in going to the Bristol Mall that day was to find someone to rob because they needed money. Jones was vague on whether he and Goins had planned to pose as police officers that night, although he stated the two had discussed the idea in the past. He was definitive on the question whether they already at that time had a plan to steal a car, responding "No, Sir" to the

13

district court's inquiries on the subject. To the court's questions, "Was this any kind of dry run to try out a, a method of operation to rob a bank? . . . or to steal a car?", Jones said: "No, Sir." The district court chided the government for presenting testimony that was "totally contrary to what you told me his testimony was going to be." Nevertheless, after hearing arguments on whether Jones's testimony was probative of plan or preparation, the district court held that the testimony was admissible.

The jury returned and Jones's testimony continued where it had left off. He testified that the two had not planned on impersonating police officers, but that when he saw Goins doing it he took the hint and followed suit. The ploy worked; Goins sent Woltz looking for his supervisor to rebut Goins's feigned suspicion that the $200 in cash he had taken from Woltz was drug money. This gave Goins and Jones an opportunity to disappear, which they did. According to Jones, the two were amazed at how easy it had been to trick Woltz into thinking they were police officers; they decided it was a "good tactic." When it came time for the carjacking nine days later, Jones testified, posing as undercover police officers was the natural choice.

While "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith," Fed. R. Evid. 404(b), such evidence may be admissible for other purposes, such as the purposes advocated by the government here, namely, "as proof of . . . preparation [or] plan." *Id*. There is no dispute that the government provided reasonable notice to Goins (which is required under the rule), so the only issue is whether the district court abused its discretion in admitting Jones's testimony as proof of preparation or plan.

14

"This Court has established a three-step process for determining the admissibility of other acts evidence under Rule 404(b)." *Jenkins*, 345 F.3d at 937. That process is as follows:

> *First,* the district court must decide whether there is sufficient evidence that the other act in question actually occurred. *Second,* if so, the district court must decide whether the evidence of the other act is probative of a material issue other than character. *Third,* if the evidence is probative of a material issue other than character, the district court must decide whether the probative value of the evidence is substantially outweighed by its potential prejudicial effect.

*Id.* (citing *United States v. Haywood,* 280 F.3d 715, 719-20 (6th Cir.2002)); *see also United States v. Carney*, 387 F.3d 436, 451 (6th Cir. 2004); *United States v. Lattner*, 385 F.3d 947, 955 (6th Cir. 2004); *United States v. Mack*, 258 F.3d 548, 553 (6th Cir. 2001). Goins's appeal implicates the second and third of these inquiries; he does not challenge the district court's conclusion that there was sufficient evidence to conclude the Woltz robbery in fact occurred.

We have held that "Rule 404(b) . . . allows the admission of other acts evidence in order to prove 'plan' if the purpose is to establish the doing of a criminal act as a step toward completing a larger criminal plan. The gateway requirement is that proof of a larger criminal plan is material. A larger criminal plan would be material if the crime charged and the other acts both constituted parts of the larger plan." *United States v. Fountain*, 2 F.3d 656, 667 (6th Cir. 1993). We have also noted that "preparation or plan [are] not in issue . . . [unless], for example, . . . the government's theory of the case [was] that the other acts were preliminary steps necessary to the success of a greater, overall criminal enterprise." *United States v. Johnson*, 27 F.3d 1186, 1194 (6th Cir. 1994).

The government contended at trial that the Woltz robbery was a "dry run" for the carjacking, which Jones and Goins had planned to test the effectiveness of a tactic they intended to use to effectuate the carjacking, i.e., posing as police officers. But the contention that Jones and Goins

planned the Woltz robbery as practice for or even in connection with the carjacking was directly contradicted by Jones himself. Jones admitted the two did not have a plan to pose as police officers during the Woltz robbery, testifying instead that Goins unilaterally – and spontaneously – decided to pose as a police officer, so he followed suit. Accordingly, the use of the police impersonation tactic was serendipitous, not planned. Mere "repeated performance" of similar crimes is not probative of a plan; rather, if the other acts evidence is offered to prove plan or preparation (as opposed to, say, identity), "there must . . . be an agreement to commit a series of crimes . . . ." *United States v. Phillips*, 599 F.2d 134, 136 (6th Cir. 1979) (citation omitted); *see also Lattner*, 385 F.3d at 957-58; *Fountain*, 2 F.3d at 667; *United States v. Ismail*, 756 F.2d 1253, 1259 (6th Cir. 1985); *United States v. Anderson*, 933 F.2d 1261, 1272 n.7 (5th Cir. 1991). Here there was no evidence of a prior agreement between Goins and Jones to commit the Woltz robbery and the carjacking as "constituent parts of a larger criminal scheme," *Fountain*, 2 F.3d at 667, so it was error to admit Jones's testimony about this prior act.

### 3.      The Error was Harmless

Nevertheless, the error was harmless because the admissible evidence introduced against Goins was overwhelming. An error is harmless if we can "say, 'with fair assurance . . . that the [jury's] judgment was not substantially swayed by the error . . . .' Whether the jury was 'substantially swayed' by the improper admission of evidence of other acts in a criminal trial generally depends on whether the properly admissible evidence of the defendant's guilt was overwhelming." *Haywood*, 280 F.3d at 724 (quoting *Kotteakos v. United States*, 328 U.S. 750, 765

(1946)); *see also United States v. Murphy*, 241 F.3d 447, 453 (6th Cir. 2001); *Layne*, 192 F.3d at 573.

The primary evidence against Goins was Jones's testimony, in which he recounted each step of the carjacking and bank robbery in detail. Other evidence and testimony also linked Goins to the crimes. Bank employees testified that the robber wore black army-style pants and a bandana as a mask; carried a handgun and distinctive gift bag; and drove Norwood's Toyota Supra (the license plate confirmed this). The government introduced video surveillance footage, which confirmed the testimony regarding what occurred during the robbery. The search of the Thomas residence uncovered, in the room shared by Antoinette and Goins, a pair of black army-style pants and a bandana tied mask-style and, in the garage, (among other guns) a handgun similar to the one used to rob the bank. Beth Thomas testified that the distinctive gift bag carried by the robber belonged to her. Furthermore, a bank employee testified that the robber at one point stood no more than three feet away from her and she looked straight at him, getting a good view of his eyes and physical build. This employee made a positive in-court identification of Goins after having seen a news story about the robbery which included Goins's photograph. In court she testified that when she saw the photograph she immediately recognized Goins as the robber. The defense did not challenge her identification on cross examination.

The jury also heard the testimony of people in whom Jones had confided during the weeks following the crimes. Beth Thomas testified about a conversation she had had with Jones in which he revealed having committed the carjacking with Goins. Michelle Lane testified about a similar conversation she had had with Jones. A prisoner who was housed with Goins testified that Goins

17

told him he was in jail because his "partner ratted him out"; that they had used the car of a kid who was murdered to commit a bank robbery; and that they had netted around $2000 in the robbery. The prisoner testified he had no prior knowledge of the carjacking and robbery. Goins also testified; he maintained that the carjacking and bank robbery were entirely Jones's doing. The jury apparently declined to credit this representation of the facts.

In light of the wealth of evidence just discussed, we can say with fair assurance that the jury's judgment was not substantially swayed by the erroneous admission of Jones's testimony regarding the Woltz robbery. *See Murphy*, 241 F.3d at 453; *Layne*, 192 F.3d at 573.

**C.     Remaining Claims**

Goins's remaining claims are that the district court erred when it denied his motion to suppress; admitted into evidence a picture he drew and sent to Jones while the two were incarcerated; and denied his motion to sever the carjacking count. In our view, the district court adequately addressed and properly denied the first claim in its order adopting the magistrate judge's report and recommendation to deny the suppression motion and the latter two claims in its order denying Goins's motion for a new trial. We have carefully reviewed the record supplied to us on appeal, the parties' briefs, and the district court's reasoning. Because the district court fully addressed these claims and correctly disposed of them in written orders, we conclude that for us to address these claims here would be duplicative and serve no useful purpose. We therefore affirm the district court's denial of Goins's remaining claims on the basis of the orders entered by the

district court on January 29, 2004 (denying the suppression motion) and June 10, 2004 (denying the motion for a new trial).

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.