587 F.2d 813
 25 UCC Rep.Serv. 65
 STANDARD ALLIANCE INDUSTRIES, INC., Plaintiff-Appellee,
v.
The BLACK CLAWSON COMPANY, Defendant-Appellant.
STANDARD ALLIANCE INDUSTRIES, INC., Plaintiff-Appellee-Cross-Appellant,
v.
The BLACK CLAWSON COMPANY, Defendant-Appellant-Cross-Appellee.
 Nos. 76-2006, 76-2007.
 United States Court of Appeals,
Sixth Circuit.
 Argued Feb. 13, 1978.
Decided Oct. 20, 1978.
Rehearing and Rehearing En Banc Denied Nov. 30, 1978.
 
 Robert T. Keeler, Taft, Stettinius & Hollister, Lawrence D. Walker, Cincinnati, Ohio, for defendant-appellant.
 Stanley M. Chesley, Waite, Schindel, Bayless & Schneider, Cincinnati, Ohio, for plaintiff-appellee.
 Before PHILLIPS, Chief Judge, KEITH and MERRITT, Circuit Judges.
 KEITH, Circuit Judge.
 
 
 1
 This case concerns a machine, a 175 ton "green monster,"[1] more formally known as a horizontal automatic radial forging facility. This machine is the cause of this multimillion dollar breach of warranty litigation between its manufacturer, the Black Clawson Company, (Black Clawson), and its purchaser, Standard Alliance Industries, Inc. (Standard Alliance). After protracted discovery, three separate trials and an unsuccessful mandamus petition to this court, this case comes before us on appeal and cross appeal from the final judgments below.
 
 
 2
 This litigation principally concerns whether the Black Clawson-built machine was in compliance with certain express warranties. After a four-week trial on the liability issue, a jury found that the machine did not comply with the warranties and, implicitly, that defendant Black Clawson had adequate notice of the breach. That same jury, at a separate trial, assessed damages at $525,000.00. Finally, at a bench trial, the district court ruled on two peripheral issues arising from the transaction. Black Clawson appeals from the jury's verdict on liability, raising a host of issues. Standard Alliance, although victorious below, cross appeals, complaining that it did not receive the full damages to which it was entitled. Black Clawson also appeals from the damages award. Finally, Standard Alliance appeals from the judgment of the court below, at the bench trial. We reverse the judgment of liability entered at the jury trial and affirm in part, reverse in part, the judgment at the bench trial.
 
 FACTS
 
 3
 This saga began in the early 1960's. Plaintiff, Standard Alliance Industries, Inc.,[2] manufactured railroad car axles, using the drop hammer method of forging, by which the axles were formed from steel bars by steam hammers. Fearing that its competitors were forging ahead with more sophisticated manufacturing techniques, plaintiff began to actively explore newer technology.
 
 
 4
 By 1965 the plaintiff determined that it should automate the forging process and purchase an automatic forging machine. There were two manufacturers who could provide such a machine: one was a European concern, known as the GFM company,[3] the other was the Black Clawson Company. Black Clawson had never manufactured an automatic forging machine before, but it did have general experience as a major machine builder.
 
 
 5
 The plaintiff was swayed by Black Clawson's reputation, its proposed design and its promised fast delivery time.[4] Serious negotiations commenced between the two companies in January of 1965. All aspects of the proposed sale were carefully reviewed and negotiated. A major stumbling block was the warranty. The seller, Black Clawson, did not wish to warrant the quality or quantity of the machine's production. The buyer, Standard Alliance, insisted on a series of performance guarantees, notably a forging cycle of two minutes and a finished axle within certain tolerances. Finally, a compromise was reached. Black Clawson would guarantee that the machine would perform a series of mechanical functions but would not guarantee the quality or quantity of production. A contract was signed on August 16, 1965, excluding implied warranties,[5] but containing certain agreed upon express warranties:
 
 
 6
 The following express warranties, which relate to mechanical function only become an adjunct to our contract clause # 1 page 11 and supersede all references to warranties that may be contained in the description of the machine pages 2-7, either expressed or implied.
 
 
 7
 Black Clawson warrants that the subject machinery will perform the following mechanical functions:
 
 
 8
 1. Press will deliver 1000 ton ram capacity at 150 strokes per minute @ 1/4 from bottom dead center.
 
 
 9
 2. Press will have a maximum speed of 250 strokes per minute with a range of 10 to 250 SPM.
 
 
 10
 3. Rams at bottom of stroke will have a parallelism of within .005 .
 
 
 11
 4. Peel and press will trace template within plus or minus .015 .
 
 
 12
 5. Feed adjustments will have a range up to 0.375 per second.
 
 
 13
 6. Peel rotation will have a range of 5 to 100 RPM and will be designed to lock at the 90o positions.
 
 
 14
 7. Peel traverse speed will have a range of 1 ft/minute to 45 ft/minute, and will be designed to lock in position.
 
 
 15
 8. The mechanical functions can be programmed to operate in automatic sequence in the specified capacities and accuracies or may be operator interrupted and/or commanded as required.
 
 
 16
 The quality and quantity of production is not the responsibility of the seller.
 
 
 17
 We shall refer to these warranties as the "page twelve" warranties, as do the parties. The contract further limited the seller's obligations under the warranty to repair or replace defective parts for a one-year period. Selling Condition 1 states:
 
 
 18
 1. Seller warrants the equipment manufactured by it will be free from defects in workmanship and material. Equipment manufactured by others than the Seller is sold exclusively under such warranty as the manufacturer may give to the Seller and to the extent enforcible by the Seller. The Seller does not warrant the amount or quality of production unless expressly stated in the specifications. If any part be found within one year from date of delivery to have been defective when delivered (any shortcoming which prevents performance to the specific standards, if any, set forth * being deemed a defect) and provided immediate notification in writing is given to the Seller, the Seller will replace or repair such part. The liability of Seller under this warranty is limited to repair or replacement of the defective part, all damage claims being excluded.
 
 
 19
 Finally, the contract specifically excluded consequential damages for any established breach of warranty.[6]
 
 
 20
 The contract also contained six pages of technical specifications for the machine and provided for a delivery time of ten to twelve months. The parties have stipulated that the total amount paid for the machine was $571,790.00.
 
 
 21
 Immediate problems arose. The manufacturing process took longer than expected and many design changes were made while the machine was being built. Finally, in July, 1967, Black Clawson began to ship the machine to Standard Alliance's East Chicago, Indiana plant. Installation was completed by October, 1967.
 
 
 22
 The machine proved troublesome from the start. On December 27, 1967, Standard Alliance sent a letter to Black Clawson outlining the machine's problems. The parties met to discuss the situation on January 2, 1968. In a follow-up letter, on January 3, 1968, Black Clawson's president promised that his company would work with Standard Alliance to fix the machine. Accordingly, a team of Black Clawson employees was sent to commence repairs. For over five months, both sides labored to make the machine operable. On June 21, 1968, defendant ceased working on the machine and withdrew its employees.[7]
 
 
 23
 On September 30, 1968, plaintiff sold its entire Standard Forgings Division to a group of buyers termed "the Wiener Group." The new purchasers also attempted to get the machine to function properly, but with no success. An outside consultant was called in; he pronounced the machine underdesigned and, as a practical matter, irreparable. The instant action was filed on May 29, 1969, almost eight months to the day after Standard Alliance completely disposed of its interests in the machine to "the Wiener Group." On July 14, 1969, "the Wiener Group" began to dismantle and to sell the machine for scrap. Eventually, a new GFM axle forging machine was brought in and put into operation.
 
 I. THE LIABILITY TRIAL
 
 24
 Plaintiff originally sued under four different theories:[8] 1) breach of the page twelve express warranties; 2) breach of the express warranty to repair or replace defective parts; 3) breach of implied warranties of merchantability and fitness for particular purpose; and 4) negligence in the building and installation of the machine. These different causes of action were based on the same factual allegations despite repair efforts, the machine could not be made to forge axles as it was supposed to. The judge directed verdicts in favor of the defendant on the negligence and implied warranty claims.[9] He then submitted the remaining two claims to the jury: 1) whether defendant had breached any of the page twelve performance warranties in the contract; 2) whether defendant had breached the "warranty"[10] to repair or replace defective parts. The jury found in favor of the plaintiff on both causes of action. In reality, the two causes of action are synonymous;[11] but they must be separated for purposes of the following discussion.
 
 
 25
 Defendant Black Clawson does not seriously dispute the extensive record of the machine's defects.[12] Instead, it claims that Count I is barred by the statute of limitations and that Count II is barred because Standard Alliance failed to give proper notice as required by UCC § 2-607(3)(a). We agree that these arguments have merit.
 
 A. The Statute of Limitations and Count I
 
 26
 Chronology is important to a precise understanding of the issues. The machine was delivered and assembled at Standard Alliance's plant in the fall of 1967. The machine proved defective, and Standard Alliance wrote Black Clawson on December 27, 1967, delineating exactly what was wrong with the machine and requesting that Black Clawson fix it. Black Clawson worked on the machine until June 21, 1968, when it abandoned repair efforts. This suit was filed on May 29, 1969.
 
 
 27
 The original contract contained a one-year limitations period; the minimum allowable under UCC § 2-725(1).[13] UCC § 2-725(1) also provides that the limitations period begins to run when the cause of action accrues. UCC § 2-725(2)[14] explains that a cause of action accrues when a breach occurs. A breach of warranty is deemed to occur upon tender of delivery "except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered." UCC § 2-725(2). Black Clawson argues that the machine was tendered in the fall of 1967 and that, even granting that the warranty extends to future performance, the cause of action under Count I accrued no later than December 27, 1967, when Standard Alliance wrote its letter claiming that the machine was defective. Standard Alliance makes numerous arguments in reply. Primarily, we must consider the question of when breach occurred. This involves analysis of two separate issues: when tender of delivery was made; whether the warranty extended to future performance. In addition, we must consider various estoppel and policy arguments.
 
 
 28
 Standard Alliance first contends, with some support in the record, that novel machines like the one here often have long "shake-down" periods before they can be made to function properly. The import of its argument is that "tender" of a defective machine should not be deemed to take place until the machine is made to run properly. Since the machine in the instant case did not function properly when initially installed in October of 1967, Standard Alliance argues, tender of delivery was never really made until June 21, 1968, when Black Clawson halted its efforts to get the machine going. Thus, even assuming that the warranty did not extend to future performance, the earliest a breach could have occurred and a cause of action accrued, on Standard Alliance's theory was June 21, 1968.
 
 
 29
 This argument is plausible, but whithers upon proper examination of the Uniform Commercial Code. UCC § 2-503(1) defines "tender of delivery" as requiring ". . . that the seller put and hold conforming goods at the buyer's disposition. . . ." Comment 1 to UCC § 2-503 explains that at times "tender" means "due tender" meaning ". . . an offer coupled with a present ability to fulfill all the conditions resting on the tendering party (which must be) followed by actual performance if the other party shows himself ready to proceed." "At other times (tender) is used to refer to an offer of goods or documents under a contract as if in fulfillment of its conditions even though there is a defect when measured against the contract obligation." Id. We think that "tender" as used in UCC § 2-725(2) is the latter and not the former. A contrary interpretation would extend the statute of limitations indefinitely into the future since a defect at the time of delivery would prevent proper "due tender" from taking place until it was corrected. Under section 2-725, a cause of action accrues upon initial installation of the product regardless whether it functions properly or not so long as the warranty does not extend to future performance. See Val Decker Packing Co. v. Corn Products Sales Co., 411 F.2d 850 (6th Cir. 1969).
 
 
 30
 Secondly, Standard Alliance argues that the page twelve warranties did extend to future performance under section 2-725(2), and that the statute of limitations thus ran from the date of discovery of the defect. It particularly points to the phrase, "Black Clawson warrants that the subject machinery Will perform the following mechanical functions."[15] Plaintiff's argument proves too much. Since all contracts contain future promises, words of futurity such as "will" are common. When the contract at issue here was signed, the machine was not yet built; the word "will" was necessarily used. The proper question is whether the statute of limitations is meant to run from the day of delivery or from the day when a defect is found sometime in the future.
 
 
 31
 Most courts have been very harsh in determining whether a warranty explicitly extends to future performance. Emphasizing the word "explicitly," they have ruled that there must be specific reference to a future time in the warranty. As a result of this harsh construction, most express warranties cannot meet the test and no implied warranties can since, by their very nature, they never "explicitly extend to future performance." See Holdridge v. Heyer-Schulte Corp. of Santa Barbara, 440 F.Supp. 1088 (N.D.N.Y.1977) (representation of product's condition at time of delivery); Raymond-Dravo-Langenfelder v. Microdot, Inc., 425 F.Supp. 614 (D.Del.1976) (specifications for pier construction); Binkley Co. v. Teledyne Mid-America Corp., 333 F.Supp. 1183 (E.D.Mo.1971), Aff'd, 460 F.2d 276 (8th Cir. 1972) (welder performance warranty did not make reference to future time); Centennial Ins. Co. v. General Electric Co., 74 Mich.App. 169, 253 N.W.2d 696 (1977) (one year warranty to repair or replace defective parts); Voth v. Chrysler Motor Corp., 218 Kan. 644, 545 P.2d 371 (1976) (one year auto warranty to repair/replace defective parts); Beckmire v. Ristokrat Clay Products Co., 36 Ill.App.3d 411, 343 N.E.2d 530 (1976) (implied warranty of merchantability of brick facing); General Motors Corp. v. Tate, 257 Ark. 347, 516 S.E.2d 602 (1974) (implied warranty of merchantability of automobile); Wilson v. Massey-Ferguson, 21 Ill.App.3d 867, 315 N.E.2d 580 (1974) (implied warranty of merchantability of tractor).
 
 
 32
 Two rare examples where express warranties were found to explicitly extend to future performance are Rempe v. General Electric Co., 28 Conn.Super. 160, 254 A.2d 577 (1969) (product was to "work properly for a lifetime") and Mittasch v. Seal Lock Burial Vault, Inc., 42 A.D.2d 573, 344 N.Y.S.2d 101 (1973) (warranty that vault "will give satisfactory service at all times").
 
 
 33
 It is clear that a buyer and a seller can freely negotiate to extend liability into the future; that is why specific allowance was made for warranties "explicitly" extending to future performance. See Raymond-Dravo-Langenfelder v. Microdot, Inc., supra at 618; 2 Anderson on the Uniform Commercial Code, Section 2-725:5, 24 (1970). In the absence of explicit agreement, however, UCC § 725(2), reflecting the drafters' intention to establish a reasonable period of time, four years,[16] beyond which business persons need not worry about stale warranty claims is applicable. This policy consideration underlying § 2-725 makes it acceptable to bar implied warranty claims brought more than a specified number of years after the sale; otherwise merchants could be forever liable for breach of warranty on any goods which they sold. See Beckmire v. Ristokrat Clay Products Co., supra ; General Motors Corp. v. Tate, supra ; Wilson v. Massey-Ferguson, supra. Similarly, an express warranty which makes no reference at all to any future date should not be allowed to extend past the limitations period. Thus, where a manufacturer warrants that a welder will meet certain performance warranties, but makes no mention of how long the warranties are meant to last; the statute of limitations begins to run at delivery. See Binkley Co. v. Teledyne Mid-America Corp., supra. See also Holdridge v. Heyer-Shulte Corp. of Santa Barbara, supra; Raymond-Dravo-Langenfelder v. Microdot, Inc., supra.
 
 
 34
 Where, however, an express warranty is made which extends for a specific period of time, i. e. one year, the policy reasons behind strict application of the limitations period do not apply. If a seller expressly warrants a product for a specified number of years, it is clear that, by this action alone, he is explicitly warranting the future performance of the product or goods for that period of time. As J. White & R. Summers Uniform Commercial Code 342 (1972), points out, if an automobile is warranted to last for twenty-four thousand miles or four years, the warranty should extend to future performance. If the car fails within the warranty period, the limitations period should begin to run from the day the defect is or should have been discovered.
 
 
 35
 In the case at bar, Black Clawson expressly warranted the machine for a period of one year. Thus, we hold that the warranties explicitly extended to future performance for a period of one year. Therefore, under § 2-725(2) the cause of action accrued when Standard Alliance discovered or should have discovered that the machine was defective, so long as the defect arose within the warranty period.[17]
 
 
 36
 Unfortunately, this holding does not assist the plaintiff. Under the contractual limitations period, Standard Alliance had one year from the date of discovery of defect to bring suit. Standard Alliance reported the machine's problems to Black Clawson by letter on December 27, 1967. At least as of this date, Standard Alliance had discovered the breach. Since suit was not brought until over a year later, on May 29, 1969, this action is barred by section 2-725(2)[18]. See Gemeni Typographers v. Mergenthaler Lino Co., 48 A.D.2d 637, 368 N.Y.S.2d 210 (1975).
 
 
 37
 Plaintiff thirdly argues that Black Clawson should be estopped from asserting the statute of limitations as a defense because it promised to repair the defects and spent over five months attempting to do so. In effect, plaintiff contends that it reasonably relied on the repair efforts, to its detriment. Decisions in other jurisdictions are split. For cases where alleged reliance on a seller's repair efforts did not toll the statute of limitations, See Binkley Co. v. Teledyne Mid-America Corp., supra, (Missouri law); Bobo v. Page Engineering Co., 285 F.Supp. 664 (W.D.Pa.1967), Aff'd, 395 F.2d 991 (3d Cir. 1968) (Pennsylvania law); Zahler v. Star Steel Supply Co., 50 Mich.App. 386, 213 N.E.2d 269 (1973). For cases where the statute was tolled, See MidCity Finance Co. v. Coleman, 232 So.2d 918 (La.App.1970); Mack v. Hugh W. Comstock Assoc., Inc., 225 Cal.App.2d 583, 37 Cal.Rptr. 466 (1964); Aced v. Hobbs-Sesack Plumbing Co., 55 Cal.2d 573, 360 P.2d 897, 12 Cal.Rptr. 257 (1961); Nowell v. Great Atlantic and Pacific Tea Co., 250 N.C. 575, 108 S.E.2d 889 (1959).
 
 
 38
 We must determine what the Ohio courts would do if confronted with this issue.[19] Although we have been unable to find direct case authority, an examination of the statute is illuminative. UCC § 2-725(4), as promulgated by the drafters of the Uniform Commercial Code, states:
 
 
 39
 "This section does not alter The law on tolling of the statute of limitations nor does it apply to causes of action which have accrued before this Act becomes effective." (Emphasis added)
 
 
 40
 Ohio's version of UCC § 2-725(4) is codified at Ohio Rev.Code § 1302.98(D). That section provides:"This section does not alter Sections 2305.15 and 2305.16 of the (Ohio) Revised Code on tolling of the statute of limitations nor does it apply to causes of action which have accrued before this Act becomes effective." (Emphasis added)
 
 
 41
 Thus, when the Ohio legislature adopted the Uniform Commercial Code, it substituted "sections 2305.15 and 2305.16 of the (Ohio) Revised Code" for "the law" in the text of UCC § 2-725(4). This significant change in the UCC's wording requires that we limit our analysis to the two Ohio statutes cited.
 
 
 42
 An examination of these statutes reveals that the limitation period is tolled if a defendant has removed himself from the state, Ohio Rev.Code § 2305.15, or if a plaintiff has suffered from some type of disability. Ohio Rev.Code § 2305.16. Neither is applicable here.
 
 
 43
 It is, of course, quite possible that the Ohio courts would apply the doctrine of equitable estoppel in a case where an innocent purchaser has relied to his detriment on a seller's promises to repair. "The principle that '. . . no man may take advantage of his own wrong' prevents a defendant whose actions have induced a plaintiff to delay filing a suit until after the running of the limitation period from asserting the statute of limitations as a defense to the action." Ott v. Midland Ross Corp., 523 F.2d 1367, 1370 (6th Cir. 1975). See Markese v. Ellis, 11 Ohio App.2d 160, 229 N.E.2d 70 (1967). Here, however, we have two corporate behemoths, well able to look out for themselves, and no evidence that one lulled the other into not suing on time. See Bowman v. Oklahoma Natural Gas Co., 385 P.2d 440 (Okl.1963).
 
 
 44
 Standard Alliance's two remaining arguments, unsupported by any authority, merit only brief mention. Standard Alliance argues that this Court should toll the running of the limitations period or otherwise find timely filing because the limitations period was contractually reduced from four years to one year. It would also find significant that approximately one-half the one-year limitations period was spent in attempted repairs.
 
 
 45
 The one-year limitations period is specifically allowed by UCC § 2-725(1). We see nothing unfair about this provision in a negotiated contract between two parties of equal bargaining power. Similarly, we find no prejudice to plaintiff resulted from the lengthy repair time. Standard Alliance still had time to file suit on the original breach of warranty claim even after termination of the repair efforts; it also had a cause of action under Count II for failure to fulfill the repair or replacement warranty.[20]
 
 B. Notice and Count II
 
 46
 Standard Alliance's claim against Black Clawson is not ended by our decision on Count I. In Count II, Standard Alliance alleges a cause of action for breach of the express warranty to repair or replace defective parts. This cause of action, which is virtually identical to Count I,[21] was not barred by the statute of limitations.[22] Thus, even if Standard Alliance sued too late on its claim that the machine was defective, it did sue on time on its claim that Black Clawson failed to repair the machine.
 
 
 47
 Black Clawson concedes that suit on Count II was timely filed, but strongly argues that it had no knowledge that anything was wrong with the machine after it quit work on it and that plaintiff's failure to report the machine's defects barred the suit.
 
 
 48
 To recapitulate: The machine was installed in October of 1967, and plaintiff's employees attempted to make it operable. A letter was sent to Black Clawson on December 27, 1967, fully outlining the machine's defects. Black Clawson responded by sending a team of employees to try to fix the machine. These employees were at Standard Alliance's plant for over five months. On June 21, 1968, Black Clawson's repairmen left Standard Alliance's plant, never to return. Plaintiff claims that this action constituted knowing abandonment of the unrepaired machine. Black Clawson claims that it thought that the machine was satisfactorily repaired and that it knew nothing about any further problems.
 
 
 49
 The controlling statute is UCC § 2-607(3)(a) which provides:
 
 
 50
 "The buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy."
 
 
 51
 Whether proper notice was given is a question of fact. Eastern Air Lines v. McDonnell Douglas Corp., 532 F.2d 957, 973 (5th Cir. 1976); Lynx Inc. v. Ordinance Products, Inc., 273 Md. 1, 327 A.2d 502, 512 (1974); L. A. Green Seed Co. of Arkansas v. Williams, 246 Ark. 463, 438 S.W.2d 717, 720 (1969). See E. C. Ernst v. General Motors Corp., 537 F.2d 105, 108 (5th Cir. 1976) (applying contract notice provision); Pritchard v. Liggett & Myers Tobacco Co., 295 F.2d 292, 298 (3d Cir. 1961) (applying Uniform Sales Act); Columbia Axle Co. v. America Automobile Ins. Co., 63 F.2d 206, 208 (6th Cir. 1933) (applying Uniform Sales Act). See also 2 Anderson on the Uniform Commercial Code § 2-607:24 (1970).
 
 
 52
 Moreover, inasmuch as section 2-607 operates as a condition precedent to any recovery, the burden of proof is on the plaintiff to show that notice was given within a reasonable time. Ehlers v. Chrysler Motor Corp., 226 N.W.2d 157, 159 (S.D.1975); Schnabl v. Ford Motor Co., 54 Wis.2d 354, 198 N.W.2d 161 (1972); L. A. Green Seed Co. of Arkansas v. Williams, supra, 438 S.W.2d at 719-20.
 
 
 53
 The district judge submitted the notice issue to the jury, which found for the plaintiff. The question presented here is whether the district judge erred when he refused to overrule the jury's decision and enter judgment N.O.V. for the defendant.
 
 
 54
 The standard which defendant must meet is a stiff one. To grant a directed verdict or J.N.O.V.,[23] the evidence must be "such that there can be but one reasonable conclusion as to the proper verdict." Wolfel v. Sanborn, 555 F.2d 583, 593 (6th Cir. 1977). Ohio's standard is the same.[24] Ohio R.Civ.Pro. 50(A). See O'Day v. Webb, 29 Ohio St.2d 215, 280 N.E.2d 896 (1972). If the evidence is clear, however, a court can rule as a matter of law that a party failed to give proper notice. Clow Corp. v. Metro Pipeline Co., Inc., 442 F.Supp. 583, 588-91 (N.D.Ga.1977); Cotner v. Int'l Harvester Co., 260 Ark. 885, 545 S.W.2d 627 (1977).
 
 
 55
 The notice requirement of Section 2-607 is explained by Official Comment 4:
 
 
 56
 The time of notification is to be determined by applying commercial standards to a merchant buyer. 'A reasonable time' for notification from a retail consumer is to be judged by different standards so that in his case it will be extended, for the rule of requiring notification is designated to defeat commercial bad faith, not to deprive a good faith consumer of his remedy.
 
 
 57
 The content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched. There is no reason to require that the notification which saves the buyer's rights under this section must include a clear statement of all the objections that will be relied on by the buyer, as under the section covering statements of defect upon rejection (Section 2-605). Nor is there reason for requiring the notification to be a claim for damages or of any threatened litigation or other resort to a remedy. The notification which saves the buyer's rights under this Article need only be such as informs the seller that the transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiation.
 
 
 58
 Some courts and commentators have taken the liberal view that almost any kind of notice of dissatisfaction is sufficient. "Quite clearly the drafters (of the UCC) intended a loose test; a scribbled note on a bit of toilet paper will do." J. White & R. Summers Uniform Commercial Code 347 (1972). See e. g., Lewis v. Mobil Oil Corp., 438 F.2d 500, 509 (8th Cir. 1971); Metro Investment Corp. v. Portland Rd. Lumber Yard, Inc., 263 Or. 76, 501 P.2d 312 (1972). Other courts have required more than minimal notice where both parties were merchants engaged in on-going transactions. Eastern Air Lines, Inc. v. McDonnell Douglas Corp., 532 F.2d 957, 970-980 (1976); Kopper Glo Fuel, Inc. v. Island Lake Coal Co., 436 F.Supp. 91, 95-97 (E.D.Tenn.1977). See Cotner v. International Harvester Co., supra. See also Fischer v. Mead Johnson Laboratories, 41 A.D.2d 737, 341 N.Y.S.2d 257 (1973).
 
 
 59
 There is no dispute that Standard Alliance gave timely notice that the machine was not in compliance with the performance warranties and that Black Clawson then spent over five months trying to fix the machine. The dispute concerns whether defendant was properly notified that the repairs were inadequate.
 
 
 60
 Black Clawson's argument can be conveniently subdivided into two subparts. First, it contends that it understood the machine to be operating properly on June 21, 1968, and that it had no knowledge that the machine was defective after that date. Second, it contends that it had no notice that Standard Alliance considered it to be in breach of the warranty to repair or replace defective parts.
 
 
 61
 The jury's implicit finding[25] that Black Clawson had knowledge that the machine was defective and improperly repaired is supportable by the evidence. Black Clawson Vice-President Romagano did testify that he thought that the machine was repaired on June 21, 1968, and that he had no idea anything was wrong afterward. The jury, however, could have disbelieved this testimony, relying on a June 24, 1968, memo written by Mr. Romagano which reveals that the machine suffered repeated failures on both June 20, 1968, and June 21, 1968. In addition, the jury could have credited letters written in June, July and August of 1968 from Mr. Romagano to a Black Clawson subcontractor, Reliance Electric Co., complaining about the failings of the machine's electric drive, a critical component. Finally, the jury could have believed expert testimony that the machine was so poorly designed that it could not be made to operate in synchronization nor be repaired to meet any of the express warranties. If so, the jury could have reasonably inferred that defendant was aware that its attempts to repair were an utter failure. Thus, there exists evidence to support a jury finding that Black Clawson had knowledge that it was in breach of the repair or replace warranty.[26]
 
 
 62
 The critical issue is whether Black Clawson had notice that it was considered to be in breach. Black Clawson emphatically argues that there is no evidence at all that it received notice of breach after it quit repair work on June 21, 1968. Standard Alliance directs us to none, and our independent examination of the record reveals none. Incredible as it may seem, Black Clawson quit repair work on June 21, 1968 and was never told anything was wrong until May 29, 1969, when suit was filed.[27]
 
 
 63
 Standard Alliance argues that it fully informed Black Clawson of the machine's defects at the beginning and that Black Clawson abandoned the machine knowing that it was defective and unrepaired. Under these circumstances, the question presented is whether it was necessary to give additional notice of the failure of repair efforts.
 
 
 64
 We think that notice should have been given. Section 2-607 expressly requires notice of "any" breach. Comment 4 says that notice "need only be such as informs the seller that the transaction is claimed to involve a breach." The express language of the statute and the official comment mandate notice regardless whether either or both parties had actual knowledge of breach. See Cotner v. International Harvester Co., supra.
 
 
 65
 We also note that this same result would take place under § 2-607's predecessor, section 49 of the Uniform Sales Act.[28] Judge Learned Hand's oft-quoted words applying section 49 are equally applicable here:
 
 
 66
 The plaintiff replies that the buyer is not required to give notice of what the seller already knows, but this confuses two quite different things. The notice 'of the breach' required is not of the facts, which the seller presumably knows quite as well as, if not better than, the buyer, but of buyer's claim that they constitute a breach. The purpose of the notice is to advise the seller that he must meet a claim for damages, as to which, rightly or wrongly, the law requires that he shall have early warning.
 
 
 67
 American Mfg. Co. v. United States Shipping Board E. F. Corp., 7 F.2d 565, 566 (2d Cir. 1925), Cited with approval in Columbia Axle Co. v. American Automobile Ins. Co., 63 F.2d 206 (6th Cir. 1933). See Eastern Air Lines v. McDonnell Douglas Corp., 532 F.2d 957, 971-972 (5th Cir. 1976); Bloch v. Eastern Mach. Screw Corp., 281 F. 777 (6th Cir. 1922); Champion Animal Food Co. v. L. B. Reich Distributing Co., 78 N.E.2d 180 (Ohio App.1947).
 
 
 68
 An examination of the policy reasons which underlie 2-607 further support our view. Notice of breach serves two distinct purposes. First, express notice opens the way for settlement through negotiation between the parties. Comment Four, Supra ; Eckstein v. Cummins, 41 Ohio App.2d 1, 321 N.E.2d 897, 901 (1974). Second, proper notice minimizes the possibility of prejudice to the seller by giving him "ample opportunity to cure the defect, inspect the goods, investigate the claim or do whatever may be necessary to properly defend himself or minimize his damages while the facts are fresh in the minds of the parties." Note, Notice of Breach and the Uniform Commercial Code, 25 U.Fla.L.Rev. 520, 522 (1973). See Eastern Air Lines v. McDonnel Douglas Corp., supra, at 972-73. Compare 3 Williston on Sales (4th Ed.), § 22-11 and J. White & R. Summers, Supra at 344 which identify three policy reasons behind the notice requirement: 1) To enable the seller to make adjustments or replacement or to suggest opportunities for cure; 2) To enable the seller to prepare for negotiation or litigation; and 3) To give the seller peace of mind from stale claims. See Steel & Wire Corp. v. Thyssen, Inc., 20 U.C.C.Rep. 892 (E.D.Mich.1976). See also Mattos, Inc. v. Hash, 279 Md. 371, 368 A.2d 993, 996 (1977) (protection against stale claims is the purpose of the statute of limitations, not the purpose of section 2-607(3)).
 
 
 69
 We do not know whether this lengthy, acrimonious lawsuit could have been settled beforehand. We do know that Standard Alliance's failure to give notice precluded the possibility of compromise.
 
 
 70
 More important, the record contains evidence suggesting the kind of prejudice which 2-607's notice requirement seeks to avoid. After Standard Alliance sold its Forgings Division to "the Wiener Group" on September 30, 1968, Wiener attempted to put the machine into operation. When that failed, the machine lay dormant. On May 28, 1969, the day before suit was filed, Standard Alliance, in cooperation with Wiener, started the machine and filmed its malfunctions. On July 14, 1969, a scant six weeks after suit was filed, Wiener began to dismantle the machine. Although Black Clawson was informed of the machine's sale,[29] it never inspected the machine after terminating repair efforts on June 21, 1968, nor was it aware that the machine was to be destroyed.
 
 
 71
 Standard Alliance contends that the destruction of the machine by a third party was proper and that Black Clawson was remiss in not seeking to inspect the machine during the six-week period after suit was filed, but before the machine was destroyed. This ignores the realities of the litigation process. Six weeks is an insignificant period of time in a case such as this which has dragged on for over nine years. In addition, it was pure chance that the machine was destroyed when it was; Wiener could have taken the machine apart whenever it wanted. Had Black Clawson gotten even minimal notice that it was being held in breach, it might very well have sought inspection and perhaps even made its own film of the machine.
 
 
 72
 Measuring the impact of potential prejudice here is, of course, difficult since Black Clawson was unable to have its own experts examine the machine. Standard Alliance emphasizes that Black Clawson designed and built the machine and worked on it for over five months. As the machine's creator, it arguably did not need to inspect it. Also, the evidence that the machine was defective was overwhelming. On the other hand, preparing for litigation is a Sui generis task. Black Clawson may have been able to put on a spirited defense, especially as to damages, had it gotten early notice and followed up by inspecting the machine. Whatever the degree of prejudice to Black Clawson, UCC § 2-607's notice requirement is designed to forestall the very difficulties which developed here. While we see no justification for the strong language in defendant's brief charging a conspiracy to hide the facts and destroy the machine, we think that this case demonstrates the wisdom of section 2-607's requirement of prompt notice.
 
 
 73
 Black Clawson also raises independent objections to the film and the circumstances of the machine's destruction, arguing that it should have had specific advance notice of both the film's production and of the machine's demolition. We need not decide these issues. We do note, however, that this Court has never sanctioned the sporting theory of justice. Adherents of the theory among the bar are reminded that a law suit is a serious matter; there is no room for games of hide and seek. Neither the federal rules nor statutory law can anticipate every twist and turn which can take place in litigation. "Legal" moves by ingenious litigants will not be countenanced where injustice would result.
 
 
 74
 These events further demonstrate the merit in those cases which hold merchants to higher standards of good faith than consumers. See Eastern Air Lines v. McDonnell Douglas Corp., supra, at 977; Kopper Glo Fuel, Inc. v. Island Lake Coal Co., supra at 96. Black Clawson and Standard Alliance worked together at all times. Black Clawson responded promptly when informed that the machine was not working properly; commercial good faith mandated that it be told that repair efforts had failed and that it was being held in breach. A new car buyer can be excused for failing, in ignorance and exasperation, to notify a car dealer of an obvious breach after persistent repair efforts have ended in failure. A merchant like Standard Alliance cannot be so excused, it should have met section 2-607's non-rigorous notice requirements.
 
 
 75
 Standard Alliance points to two cases, Ernst v. General Motors Corp., 482 F.2d 1047 (5th Cir. 1973), Appeal following remand, 537 F.2d 105 (5th Cir. 1976), and Metro Invest. Corp. v. Portland Rd. Lumber Yard, Inc., 263 Or. 76, 501 P.2d 312 (1972), for the proposition that proper notice, once given, is sufficient for all related breaches. Standard Alliance's position is that since it concededly gave proper notice that the machine was defective on December 27, 1967, it did not have to give notice later on that repair efforts to cure the defects had failed.
 
 
 76
 We reject this argument. In Ernst, supra, the court merely concluded that a letter complaining of delays in the start-up of a construction project could be reasonably construed to encompass problems caused by severe winter working conditions which would not have occurred but for the delay. Also, the court did not think that once initial complaint about delay was made, that additional notice of delay had to be given on a regular basis. In Metro Invest. Corp., supra, the buyer gave prompt notice of a defect. The parties met and agreed to wait and see if the defect improved. The Oregon Supreme Court found that the initial notice was sufficient, even though no complaint was made for two years thereafter.
 
 
 77
 In the instant case, the two warranties are distinct and notice serves different functions for each. When the machine was found to be in breach of the page twelve performance warranties, notice was necessary so that Black Clawson could come in and try to fix the machine. When repair efforts failed, and Black Clawson was allegedly in breach of its warranty to repair or replace defective parts, notice would alert Black Clawson that Standard Alliance thought that repairs were defective and that perhaps litigation was contemplated. At this point, the parties could have discussed settlement, and Black Clawson could have sought evidentiary support for its position that the machine was indeed repaired. Black Clawson was alerted that the machine was defective, but not alerted that its repair efforts were defective. We cannot allow notice of one breach to be carried over to create notice of a subsequent related, but distinct, breach.
 
 
 78
 We realize that our holding bars what is apparently a meritorious claim. Standard Alliance's inexplicable failure to give any notice whatsoever that Black Clawson was in breach of its repair/replace warranty is fatal; underlying standards of commercial good faith, codified in UCC § 2-607, mandate this result.
 
 
 79
 Our ruling makes it unnecessary to consider the numerous other issues raised concerning the liability or the damages trial.
 
 II. PREJUDICIAL CONTACT WITH THE JURY
 
 80
 Although unnecessary to our decision, an additional issue warrants mention. As indicated, trial on liability was separated from trial on damages; the same jury, however, was to hear both. The jury returned its verdict on liability on September 12, 1975. Black Clawson contends that immediately after the liability verdict, Standard Alliance's counsel improperly approached two jurors as they were approaching an elevator in the Federal Courthouse and thanked them for their verdict.[30] Black Clawson claimed improper contact and promptly filed a motion for mistrial, with accompanying affidavits as to what had transpired. Instead of summoning the attorneys and interrogating the jurors on the record or otherwise proceeding to openly test the validity of the motion, the district court, without notice to either party, sent his law clerk to interview the jurors about the alleged incident. The court concluded, on the basis of this ex parte communication, that any jury contact which had taken place had been trivial.[31]
 
 
 81
 The court might very well have been correct, but the manner in which it made the determination was improper. The correct response of a trial judge, when confronted with allegations of improper jury contact, is to give notice to the parties and to question the jurors on the record about any alleged incident.[32] See Petrycki v. Youngstown & Northern Ry. Co., 531 F.2d 1363 (6th Cir.), Cert. denied, 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 138 (1976); United States v. Gay, 522 F.2d 429 (6th Cir. 1975). See also United States v. Florea, 541 F.2d 568, 572-73 (6th Cir. 1976), Cert. denied, 430 U.S. 945, 97 S.Ct. 1579, 51 L.Ed.2d 792 (1977).
 
 
 82
 Ex parte contact between judge and jury raises a presumption of reversible error. Petrycki v. Youngstown & Northern Ry. Co., supra, at 1367; United States v. Gay, supra, at 435. In United States v. United States Gypsum Co., --- U.S. ----, ----, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978), the Supreme Court warned of the dangers of ex parte contact between a judge and any member of the jury. The court found reversible error when a meeting between the trial judge and a foreman, which had been consented to by the parties, was allowed to drift into what "amounted to a supplemental instruction to the foreman relating to the jury's obligation to return a verdict . . ." --- at ----, 98 S.Ct. at 2886. See also Rogers v. United States, 422 U.S. 35, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975); Fillippon v. Albion Vein States Co., 250 U.S. 76, 39 S.Ct. 435, 63 L.Ed. 853 (1919). Here, the length and nature of the law clerk's contact with the jury is unknown. No record was kept, not notice was given to the parties. Under these circumstances, the presumption of prejudicial error cannot be rebutted. This alone would have required reversal, at least of the damages verdict rendered by the same jury after the incident took place.[33]
 
 III. THE BENCH TRIAL
 
 83
 At a separate bench trial, the district court ruled on two matters which were peripheral to the main suit. The first issue concerned "back charges." Selling Condition No. 15 of the contract provided:
 
 
 84
 In no event shall any installation, erection, modification, or corrective work be done by the buyer for the account of the seller until after full particulars (including an estimate of material cost, amount, and rate of labor required) have been submitted in writing to and approved in writing by the seller. Returned items will not be accepted unless seller has previously agreed to such return in writing and supplied written shipping instructions.
 
 
 85
 Plaintiff, in Count IV of its complaint, claimed that it incurred a total of $55,247.84 in these charges. The district judge found that plaintiff had not complied with the contract's Selling Condition, Supra, and allowed only $807.09 of this amount.
 
 
 86
 We think that the evidence fairly reveals that the parties made an express oral modification of Selling Condition No. 15, which operated as a waiver of Black Clawson's rights under this section of the contract. Although, under Ohio law, courts must look carefully at oral modifications of a written contract, White Co. v. Canton Transportation Co., 131 Ohio St. 190, 2 N.E.2d 501, 505 (1936), if the evidence is clear, a waiver can be found. See Ohio Farmers Ins. Co. v. Cochran, 104 Ohio St. 427, 135 N.E. 537 (1922). Harold G. Challman, plaintiff's "man in charge," testified without contradiction that he and Black Clawson employee James Gardner had agreed that Standard Alliance would keep a running total of expenses incurred while the machine was being worked on. Two internal memoranda authored by Black Clawson executive A. P. Romagano support this testimony.[34] Standard Alliance and Black Clawson worked together for over five months trying to get the machine to perform properly. In light of their almost daily interaction, it made good sense for Standard Alliance to keep a running tab on the back charges instead of continually going to Black Clawson for written approval. This type of good faith conduct by the parties should be encouraged, not discouraged.[35]
 
 
 87
 Although the district judge, in his findings of fact below, questioned the amount of the charges, we see no need to remand. Standard Alliance's unchallenged ledger entries, kept pursuant to the oral agreement between the parties, are fully adequate to support its claim.
 
 
 88
 The second issue decided at the bench trial, dealt with defendant's counterclaim. In early 1968, Standard Alliance determined to purchase a spare ram and piston assembly for the machine. Black Clawson agreed to sell the spare ram to Standard Alliance for $25,950,000. It is uncontroverted that although delivered late, the ram was accepted but never paid for. The district court found no evidence that the ram was unsatisfactory or that it failed to meet specifications.[36] Accordingly, we have no trouble affirming the district judge's entry of judgment for Black Clawson on its counterclaim.
 
 
 89
 In conclusion, we reverse the judgment entered pursuant to the jury's verdict on the issue of liability for breach of warranty. We also reverse the judgment entered by the district court on Count IV of the complaint and remand with directions to enter judgment for Standard Alliance for $55,247.84. Finally, we affirm the judgment entered for Black Clawson on its counterclaim.
 
 
 90
 Each party is to bear its own costs.
 
 
 
 [1]
 It was so dubbed by plaintiff's employees
 
 
 [2]
 At the time, the company was known as Standard Forgings Corporation. To avoid confusion, we shall refer to plaintiff as Standard Alliance throughout
 
 
 [3]
 GFM stands for Gesellschaft f ur Fertingungstechnik und Maschinenbau Ges M.B.H. literally translatable as Society of Forging Engineers and Machine Builders. We shall at all times refer to this company as GFM
 
 
 [4]
 We also note, as did the district judge below, that the GFM machine was much more costly than the Black Clawson machine
 
 
 [5]
 Selling Condition No. 9 states in relevant part:
 Any representation, oral or written, any express or implied warranties including but not limited to warranties of merchantability or fitness for a particular purpose and any terms or conditions which are not set forth herein are hereby excluded and shall be of no effect.
 
 
 *
 on Page 12 hereof
 
 
 [6]
 Selling Condition No. 3 states:
 The Seller is not responsible for claims based upon downtime, overhead, labor, damage to machinery, spoilage and loss of production or profit or for consequential damage for any cause arising out of or in connection with this agreement.
 
 
 [7]
 There were two service calls on the machine after June 21, 1968. The first was from July 8 to July 11, 1968, when Black Clawson's James Gardner returned to try to improve the quality of the axles being produced. A memorandum he wrote about the visit indicated that the machine was functioning properly, although this was contradicted at trial by Standard Alliance's Harold Challman
 The second visit occurred on November 7, 1968, when "the Wiener Group" attempted to put the machine into production; Black Clawson was called in to correct a minor electrical malfunction.
 
 
 [8]
 Plaintiff advanced an additional cause of action dealing with the issue of "back charges." This, together with the defendant's counterclaim, is considered in Part III, Infra
 
 
 [9]
 Plaintiff has not appealed from these rulings
 
 
 [10]
 Both parties, throughout trial and on appeal, have referred to defendant's agreement to repair or replace defective parts as an express warranty. This provision does appear to meet UCC § 2-313's definition of express warranties in that it is a "promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain . . ." It is perhaps more accurate to term defendant's promise to repair or replace defective parts as the Remedy to be invoked if the mechanical performance warranties are breached. This is apparently the view taken in UCC § 2-316 which distinguishes between excluding or modifying warranties and limiting remedies for breach of warranty. See also UCC § 2-719. Both parties agree that the repair or replacement of defective parts agreement is a warranty; we need not discuss what important distinctions exist between warranties and warranty remedies. See Lincoln Pulp & Paper Co., Inc., v. Dravo Corp., 436 F.Supp. 262, 276-77 (D.Me.1977); Ford Motor Co. v. Reid, 250 Ark. 176, 465 S.W.2d 80 (1971); J. White & R. Summers, Uniform Commercial Code § 12-12 (1972)
 
 
 [11]
 Count I alleges that the machine failed to meet the page twelve warranties. To find liability, however, the jury must also find that the contract's exclusive remedy or repairing the machine did not or could not cure the defects and thus "failed of its essential purpose." UCC § 2-719. Count II alleges that Black Clawson breached its warranty to repair or replace defective parts. To find a breach, of course, the jury must find that the machine was defective in the first place
 
 
 [12]
 Both sides kept logs of repair efforts from approximately January to June of 1968 which detailed the machine's deficiencies. Standard Alliance, which had every reason to put the machine into production, was never able to do so, even with defendant's help. The "Wiener Group" also tried to get the machine to work right. An outside consultant they called in concluded that the machine was underdesigned. The "Wiener Group" concluded that the machine could not be repaired, so they eventually scrapped it and replaced it with a GFM machine. Numerous witnesses testified that the machine was defective. Plaintiff's expert witness testified that the machine was so poorly designed and constructed that it could not be repaired so as to meet the page twelve warranties
 
 
 [13]
 UCC § 2-725 provides:
 (1) An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued. By the original agreement the parties may reduce the period of limitation to not less than one year but may not extend it.
 (2) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.
 (3) Where an action commenced within the time limited by subsection (1) is so terminated as to leave available a remedy by another action for the same breach such other action may be commenced after the expiration of the time limited and within six months after the termination of the first action unless the termination resulted from voluntary discontinuance or from dismissal for failure or neglect to prosecute.
 (4) This section does not alter the law on tolling of the statute of limitations nor does it apply to causes of action which have accrued before this Act becomes effective.
 
 
 [14]
 See fn. 13
 
 
 [15]
 This was also the reason why the district court below denied summary judgment and J.N.O.V. on this issue
 
 
 [16]
 We are aware that some states have adopted a limitations period greater than four years, E. g. Wis.Stat. § 402.725 (6 years); Okla.Stat. tit. 12 A § 2-725 (5 years). Ohio, however, follows the majority of the states in establishing a four year period. Ohio Rev.Code § 1302.98. The parties agree that Ohio law governs this diversity action
 
 
 [17]
 Centennial Ins. Co. v. General Electric Co., supra, and Voth v. Chrysler Motor Corp., supra, indicated that contractual provisions to repair or replace defective parts for a period of one year were not warranties extending into the future for one year, but remedies to be invoked should something go wrong. We see no conceptual distinction between saying that a product is warranted for one year against defects, the remedy limited to repair or replacement and saying that should a breach be discovered within one year, the seller will repair or replace defective parts. Both are warranties explicitly extending to future performance. We recognize that there may be differences between remedies and warranties, See fn. 10, but we do not believe that these distinctions make a difference here
 
 
 [18]
 This assumes that we agree with Standard Alliance that the machine was never repaired. Assuming that the machine was repaired at some point, then the failure to give notice of subsequent difficulties would invalidate the claim. See Part I(B) Infra
 
 
 [19]
 As noted in fn. 16, there is no dispute that Ohio law controls this diversity case
 
 
 [20]
 Our disposition of Count I on limitations grounds makes it unnecessary to consider the interesting question whether notice of breach had to be given a second time, after repairs failed. Since the repair or replacement warranty is also a remedy to be invoked if the machine did not meet its performance warranties, there is certainly room to argue that UCC § 2-607(3) requires notice that the repair or replacement remedy has failed "of its essential purpose" under UCC § 2-719(2)
 
 
 [21]
 See fn. 11
 
 
 [22]
 Black Clawson terminated its repair efforts on June 21, 1968; suit was filed within a year's time, on May 29, 1969
 
 
 [23]
 The standards for the granting of a directed verdict and judgment N.O.V. are the same. Oneil v. Kiledjian, 511 F.2d 511, 513 (6th Cir. 1975); Holt v. Continental Insurance Co., 325 F.Supp. 283 (E.D.Tenn.), Aff'd, 440 F.2d 652 (6th Cir. 1971); Ohio R.Civ.Pro. 50(A)
 
 
 [24]
 We are bound by state law as to the sufficiency of the evidence. Chumbler v. McClure, 505 F.2d 489, 491 (6th Cir. 1974)
 
 
 [25]
 The district judge properly instructed the jury on the notice issue. At the subsequent trial on damages, the same jury made the explicit finding that the machine was irreparable
 
 
 [26]
 The evidence is not one-sided, however. The record indicates that the machine would operate, but was subject to breakdowns and produced a poor product. Repair efforts at times achieved temporary success or offered the hope of success. For example, in a July 15, 1968 internal memorandum, Standard Alliance's Harold Challman indicated that with two weeks of certain indicated repairs, the machine would be ready to make a production run. There thus exists some basis for Black Clawson's subjective belief that the machine was in compliance with the page twelve warranties. Internal Black Clawson memoranda, notably an October 3, 1968 memo from Vice-President Romagano to President Landegger support this belief
 This confusion further underscores the need to give clear notice; especially in a commercial setting where two companies have interacted at different levels, from President to maintenance worker.
 
 
 [27]
 Black Clawson pressed this issue at trial. Standard Alliance's President Erwin Schulze admitted that no written notice was sent; he did not know whether oral notice was given. Executive Vice-President William G. Shaw, who at the time was head of Standard Alliance's forging division, knew of no communication between the parties concerning the machine's defects after June 21, 1968. Roy W. Clansky, a Standard Alliance Vice-Chairman of the Board intimately involved in the machine's purchase, testified that Black Clawson never failed to respond when called. He did not recall ever getting in touch with his counterpart at Black Clawson to complain about the machine after January 4, 1968. Russel E. Reum, Standard Alliance's purchasing agent, knew of no notice to Black Clawson indicating dissatisfaction with repair efforts after January of 1968. Black Clawson Executive Alfred Romagano testified that Black Clawson never heard a complaint about the machine after June of 1968
 The evidence in the record concerning the circumstances of Black Clawson's termination of repair efforts on June 21, 1968, shows an amicable parting after months of mutual cooperation. Contacts between the parties after June 21, 1968, were minimal and most had nothing to do with the machine's defects. Standard Alliance invited Black Clawson to a trade association tour of its plant in September, 1968, and discussed settling "backcharge" claims for repairs. In addition, two brief service calls were made. Although the record as to the service calls and backcharge negotiations is sketchy, See fn. 7 and 34, there is no evidence that the issue of breach of warranty was ever raised directly, and Standard Alliance does not argue that it was.
 
 
 [28]
 Section 49 provided:
 In the absence of express or implied agreement of the parties, acceptance of the goods by the buyer shall not discharge the seller from liability in damages or other legal remedy for breach of any promise or warranty in the contract to sell or the sale. But, if, after acceptance of the goods, the buyer fails to give notice to the seller of the breach of any promise or warranty within a reasonable time after the buyer knows, or ought to know of such breach, the seller shall not be liable therefor.
 
 
 [29]
 Black Clawson claimed in its brief that it did not know of the sale to "the Wiener Group." The record is clear to the contrary and Black Clawson conceded the point in its reply brief
 
 
 [30]
 It does not appear from the record that the district judge issued a cautionary instruction to the jury that it not discuss the case with anyone after it rendered its verdict as to liability. Since the same jury was to later hear evidence as to damages, such an instruction would have been in order
 
 
 [31]
 This incident was the subject of a mandamus petition to this Court, which was dismissed as moot after the damages trial commenced
 
 
 [32]
 Black Clawson's affidavits presented a Prima facie case of impropriety, sufficient to require a formal inquiry. Cf. Mattox v. United States, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892). The district judge apparently agreed, because he sent his law clerk to ask the jurors what had transpired. Under these circumstances, we need not decide what allegations of improper jury contact are required before an inquiry must be made or when failure to make an inquiry is reversible error. See South-East Coal Co. v. Consolidation Coal Co., 434 F.2d 767, 791-92 (6th Cir. 1970), Cert. denied, 402 U.S. 983, 91 S.Ct. 1662, 29 L.Ed. 149 (1971)
 
 
 [33]
 There is no need to discuss Black Clawson's claim that this error would require a new trial on the liability issue as well. See Gasoline Products Co. v. Champlin Refining Co., 283 U.S. 494, 51 S.Ct. 513, 75 L.Ed. 1188 (1931)
 
 
 [34]
 Mr. Romagano's memorandum of August 22, 1968 states that "Standard (Alliance) is going to present us with what I suspect is a very sizable bill for back charges." Yet, instead of indicating that the bill was unenforceable, he requested information from another company official for bargaining purposes. In an October 3, 1968, memorandum, Mr. Romagano notes that Mr. Challman (of Standard Alliance) had called him and indicated that back charges would be between $55,000.00 and $60,000.00. Instead of disclaiming liability, Mr. Romagano said that he thought that the charges could be settled for between $20,000.00 and $25,000.00
 
 
 [35]
 Mutual modification of a contract may also implicate the hoary preexisting duty rule which invalidates a contractual modification made without consideration. See Heriott v. Marine, 96 Ohio App. 174, 121 N.E.2d 305 (1953). The rule has been properly criticized as an artificial obstacle to good faith contract changes, See Note, The Preexisting Duty Rule of Foakes v. Beer a Victory by Default for Stare Decisis, 11 Ariz.L.Rev. 344 (1969), and has been discarded by the authors of the Uniform Commercial Code, See UCC § 2-209. In this case, assuming that the rule applies, we find valid consideration, because Standard Alliance, by agreeing to keep a running tab, was precluded from immediately collecting back charges. This forced forebearance benefitted Black Clawson, as illustrated by the fact that it was not until October of 1968 that it was even informed of the charges. See Boymer v. Birmelin, 227 So.2d 358, 362 (Fla.App.1969); 1 Williston on Contracts § 135 (3rd Ed. 1957). Cf. DeCicco v. Schweitzer, 221 N.Y. 431, 117 N.E. 807 (1917)
 
 
 [36]
 Standard Alliance argues that the parties agreed that if the ram on the machine failed within one year, there would be no charge for the replacement ram. This directly contradicts the purchase order which provided for 50 percent payment within 90 days, with the balance due in one year. The district court's resolution of this evidentiary clash in favor of Black Clawson was not clearly erroneous. Rule 52, F.R.Civ.Pro